# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**BIBLE BELIEVERS; RUBEN CHAVEZ**
(a.k.a. Ruben Israel); **ARTHUR FISHER;**
and **JOSHUA DELOSANTOS.**

       Plaintiff,

vs.

                                   CASE NO:  2:12-cv-14236
                                   HON. Patrick J. Duggan

**WAYNE COUNTY; BENNY N.**
**NAPOLEON**, in his official capacity
As Sherriff; Wayne County Sherriff's
Office; **DENNIS RICHARDSON**,
Individually and in his official capacity
As Deputy Chief, Wayne County Sherriff's
Office; and **MIKE JAAFAR**, individually
And in his official capacity as Deputy Chief,

       Defendants.

**AMERICAN FREEDOM LAW CENTER**
**ROBERT J. MUISE** (P62849)
PO BOX 131098
Ann Arbor, Michigan 48113
Phone: (734) 635.3756
Email: rmuise@americanfreedomlawcenter.org

**NABIH H. AYAD & ASSOCIATES, P.C.**
**NABIH H. AYAD** (P59518)
Attorney for Defendants
2200 Canton Center Rd., Ste. 220
Canton, MI 48187
Phone: (734) 983-0500
Fax: (734) 983-0520
Email: ayadlaw@hotmail.com

**DAVID YERUSHALMI**
PO BOX 6358
Chandler, Arizona 85246
Phone: (646) 262-0500
Email: david.yerushalmi@verizon.net

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# OR IN THE ALTERNATIVE

# DEFENDANTS' MOTION TO DISMISS

## ISSUES PRESENTED

I.   Do Plaintiffs' claims **fail to meet the minimum pleading requirements** of *Iqbal* where the Complaint alleges in an entirely conclusory manner, that "Defendants" (in generic plural form) committed a constitutional violation without indentifying which Defendants took which actions, against which Plaintiffs?

       Defendants: Yes

       Plaintiffs: No

II.  Are Plaintiffs' claims **barred by the Doctrine of Qualified Immunity** where the law in this Circuit permits law enforcement officers to preserve the peace by removing a speaker for his own protection, but no law supports Plaintiffs position that the Sheriff's Department was required to provide Plaintiffs with a personal security force for their sole protection and benefit?

       Defendants: Yes

       Plaintiffs: No

III. Have Plaintiffs **failed to establish *Monell* liability** against Defendant Wayne County where Plaintiffs fail to adequately allege and/or identify a policy aimed at allegedly restricting Christian religious speech?

       Defendants: Yes

       Plaintiffs: No

IV.  Were Defendants actions were motivated by their **concerns for public safety** rather than the content of Plaintiffs' message.

       Defendants: Yes

       Plaintiffs: No

## <u>TABLE OF AUTHORITIES</u>

*Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)

*Cox v. Louisiana*, 379 U.S. 536, 554, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965).

*Dunn v. Matatall*, 549 F.3d 348 (2008)

*Glasson v. Louisville*, 518 F.2d 899, 909 (6th Cir. Ky. 1975)

*Grider v. Abramson*, 180 F.3d 739, 743-44 (6th Cir. 1999)

*Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978).

*Pembaur v. City of Cincinnati*, 475 U.S. 468, 483 (1986).

*Potts v. City of Lafayette*, 121 F.3d 1106, 1111-1112 (7th Cir. Ind. 1997).

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387, 89 S. Ct. 1794, 23 L. Ed. 2d 371 (1969)

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. Pa. 2008)

*Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977)

## TABLE OF CONTENTS

**STATEMENT OF FACTS**..................................................................... 1

**STATEMENT OF LAW AND ARGUMENT**................................................ 8

    **PLAINTIFFS FAIL TO MEET THE MINIMUM PLEADING REQUIREMENTS OF US V. IQBAL**........................................................ 8

    **AS GOVERNMENT OFFICIALS, DEFENDANT JAAFAR AND DEFENDANT RICHARDSON ARE ENTITLED TO QUALIFIED IMMUNITY**................................................................................. 11

        *The allegations, viewed in a light most favorable to the plaintiff do not show that a constitutional violation has occurred*............... 13

        *There is no precedential support for Plaintiffs' theory that the law required Defendants to assign them any number of officers to act as their personal security detail*............................................ 16

    **PLAINTIFFS CANNOT ESTABLISH *MONELL* LIABILITY; THAT THE ALLEGED ACTS EQUATE TO A "POLICY, PRACTICE, PROCEDURE AND/OR CUSTOM" OF DEFENDANT WAYNE COUNTY**................................................................................. 19

    **PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS EFFECTUATED A HECKLERS VETO WHERE DEFENDANTS TOOK A PRACTICAL AND EVEN HANDED APPROACH TO MAINTAINING PUBLIC SAFETY**........................................................ 21

        *Defendants' actions were not content or viewpoint based Defendants' actions were motivated by public safety concerns.*.................................................................................... 24

**CONCLUSION**.......................................................................... 25

**CERTIFICATE OF SERVICE**........................................................... 27

iv

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Articles of Incorporation, Arab International Festival, LLC |
| B | Festival Grounds Map |
| C | Artisan and Information Tables Map |
| D | Impact International Ministries "Arab International Festival" |
| E | Wayne County Sheriff's Department Operations Plan – Arab American International Festival |
| F | Affidavit of Deputy Chief Sheriff Dennis Richardson |
| G | May 9, 2012 Correspondence |
| H | Sheriff's Department Response to May 9, 2012 Correspondence |
| I | Post Operations Report |
| J | Impact International Festival Video 2012 |

## STATEMENT OF FACTS

**1.  The Arab International Festival**

From June 15 through June 17, 2012 the Arab International Festival, LLC hosted the 15th annual Arab International Festival (hereinafter "Festival"). (**Exhibit A**). The three-day Festival is a cultural celebration of the area's Middle Eastern heritage. The Festival is free and open to the public.  *Saieg v. City of Dearborn*, 641 F.3d 727, 730 (6th Cir. 2011). Each year, over 250,000 people attend the Festival, which features carnival rides, a main stage with live entertainment, international food, merchandise sales, a tent targeted at children, and tents in which artisans and other vendors display products. *Id*. In 2012, twenty-six artisan vendors, thirty-seven information tables and/or food vendors, and twenty-two sponsor booths took part in the Festival. (**Exhibit B:** *Festival Grounds Map;* **Exhibit C:** *Artisan/Information Map*). With such a large number of visitors, close attention is paid by law enforcement to issues related to street closures, crowd control, and public safety.

The Festival grounds extend approximately fourteen city blocks, east to west, on Warren Avenue in east Dearborn. (**Exhibit B**) The Festival occupies the public roads and sidewalks. *Id*. The main stage occupies the western edge of the Festival, while carnival rides are on the eastern edge of the Festival. *Id*. A series of tents line the rest of the street. *Id*. The other tents are dedicated to festival sponsors, food vendors, artisans, and information tables staffed by community, religious, and corporate organizations. (**Exhibit C**). The artisans' and other vendors are all located within the "inner perimeter" of the Festival: the eight blocks of Warren Avenue between Hartwell Street to the west and Kingsley Street to the east, as well as one block south on Miller Road, which intersects Warren Avenue. (**Exhibit B**).

1

The Festival rents booths to a diverse group of applicants. The application process to obtain a booth is simple and straight forward. In order to obtain a booth an interested applicant need only contact the Festival, fill out the application, and pay the requisite deposit. Plaintiff Bible Believers did not request a booth, but instead elected to march through the main thoroughfare of the festival. [Dkt. 1 ¶ 37].

The Arab International Festival maintains a long and proud history of cultural and religious inclusion. In fact, vendors for the 2012 Festival included a number of groups with a Christian or non-Muslim religious message including Christian Aid Ministries, Merriman Baptist Church, Josh McDowel Ministry, Rivers of Life, Light & Life Arabic Free Methodist Church, and Impact International Ministries. (**Exhibit C**).

Impact International Ministries is a Christian organization that gathers Christian volunteers from across the Southern United States to participate in the construction and maintenance of the Festival. (**Exhibit D:** *IIM "Arab International Festival."*).[1] Impact International volunteers are responsible for setting up the Festival on Friday morning, assisting festival leadership throughout the Festival, staffing the event, and providing clean-up on Sunday night. *Id*. The festival would not be possible without the aid from Christian volunteers from Impact International Ministries and the Ministry has provided this support since 1999. *Id*.. Each year Impact International Ministries produces a short video which highlights their experience at the festival and illustrates the general character of the Arab International Festival. (**Exhibit J:** IIM Festival Video 2012).[2]

---

[1] Also found at http://impactint.net/Arab-Intl-festival.htm. Last viewed January 9, 2013.
[2] Also found at impactint.net/festival.wmv

**2.  The Wayne County Sheriff's Department Role.**

Due to the size, number of attendees, and pre-festival intelligence, the Wayne County Sheriff's Department provides extensive law enforcement for the event. Prior to the 2012 Festival, intelligence revealed that a number of organizations, including Pastor Terry Jones and Plaintiff Bible Believers intended to attend the Festival in order to provoke patrons of the Festival and law enforcement officers in order to capture the alleged negative reaction of the crowd on video camera. (**Exhibit E:** *Operations Plan – Arab American International Festival at pg. 1, 2.0 Situation).* Accordingly, the Sheriff's Department adopted a mission statement to "provide Wayne County citizens, festival patrons, organizers, [and] merchants with [a] law enforcement presence and to ensure the safety of the public, and keep the peace in the event that there is a disturbance." *Id at pg 1, 1.0 Mission.*

Both Defendant Deputy Chief Richardson and Deputy Chief Jaafar attended as officers in the Executive Command Unit. *Id at pg. 2, 6.0 Personnel.* The Wayne County Sheriff's Department provided thirty-four (34) Deputy Sheriffs and nineteen (19) reserve officers (Res.) *Id.* The force included a mounted unit with six (6) horses, a mobile command post, and covered the entire parade divided into multiple zones. *Id.* To place the size of the force in context, the personnel allocated to the Festival is larger than the Sheriff's Department contribution to the World Series or the President of the United States when he visits Michigan. (**Exhibit F:** *Affidavit of Chief Deputy Sheriff D. Richardson*). Likewise, the security force provided to the Festival is considerably greater than the security force allocated to similar size Festivals (e.g. The National Cherry Festival). *Id.*

3

The Wayne County Sheriff's Department is the exclusive law enforcement agency for the Festival. *Id. See also Exhibit E at pg. 2, 3.0 Law Enforcement Response*. The City of Dearborn does not provide security within the Festival and does not provide ancillary support beyond their normal patrol activities. *Id*.

The present action is filed against Defendant Wayne County, and two (2) individual Chief Deputies; Defendant Richardson and Defendant Jaafar. [Dkt. 1]. Defendants Richardson and Jaafar are acting Deputy Chief's for the Sheriff's Department and were present for the events which are the subject of Plaintiff's Complaint. *Id*.  Both Defendants Richardson and Jaafar are sued in their individual and official capacities. *Id*. Wayne County Sheriff Benny N. Napoleon is named in his official capacity only, and was not present for the 2012 festival. *Id*.

### 3.   The Bible Believers.

The "Bible Believers" are an alleged religious group that attempts to hijack public events with provocative signs and imagery in order to draw media attention. Examples include signage such as, "Muhammad is a … liar, false prophet, murderer, child molesting pervert," and "AIDS, judgment or cure?"[3]

Plaintiffs began protesting the Festival in 2011 after Pastor Terry Jones and others received media attention for similar exploits.[4] In their Complaint, Plaintiffs summarize their grievance as, "In short, sharia [law] is being enforced by a hostile mob, and Defendants are aiding and abetting its enforcement by permitting the Muslims to silence the Christians' message through violence." [Dkt. 1 ¶ 66].

---

[3] See e.g. http://officialstreetpreachers.com/Photo%20Gallery/PREACHING_TO_SODOMITES.html
[4] See e.g. http://www.huffingtonpost.com/2011/06/17/terry-jones-dearborn-arab-festival_n_879598.html

### 4.   The 2012 Festival

On May 9, 2012, in preparation for their attendance at the 2012 Festival, Plaintiffs sent a letter to Defendants informing them of their intent to appear at the 2012 Festival and warning of potential violence (**Exhibit G:** *May 9, 2012 Correspondence*).

On June 14, 2012 the Wayne County Department of Corporation Counsel responded, informing Plaintiffs from the outset that the Sheriff's Department "provides law enforcement to members of the public in a non-discriminatory manner." (**Exhibit H:** *Sheriff's Department Response*). Corporate counsel expressed her concern that, "your letter appears to be little more than an attempt to create evidence for use in future litigation" and further informed Plaintiffs that, "[t]he WCSO owes a duty to the public as a whole and is not required to serve as a security force for the sole benefit of Ruben Israel and the 'Bible Believers.'" *Id*. The response concluded by asserting the Sheriff's Department overarching policy that, "[t]he WCSO will not restrict the First Amendment Rights of any individual, but, by following the laws requiring the observance of such rights, the WCSO neither cedes its right to maintain the peace nor assumes unto itself liability for the illegal conduct of others." *Id*.

The 2012 Festival was set to begin at approximately 4:00 p.m. on June 14, 2012. (**Exhibit B:** *Festival Grounds Map*). Plaintiffs arrived at the festival at approximately 5:00 p.m.. (**Exhibit F**). Plaintiffs were not denied entry to the festival and were permitted to express their message freely throughout the festival. *Id*. In fact, Plaintiffs did express their message freely, without objection of Defendants, throughout the festival and through a number of different mediums. [Dkt. 1]. As Plaintiffs point out, they freely entered the Festival and "engaged in their

5

expressive activity along the public sidewalks and other public areas where pedestrian traffic was permitted." [Dkt. 1 ¶ 37]. Plaintiff's freely engaged in their expressive conduct by wearing t-shirts, and carrying signs and banners. *Id*. Plaintiff's further admit that, "[t]here was no prohibition on carrying signs or banners or wearing t-shirts displaying expressive religious message on the public sidewalks..." *Id ¶ 40*.

Over the subsequent hour Plaintiffs roamed the festival freely and interacted with other festival attendees. During this time they freely shared their message with the Festival attendees. Shortly thereafter, Plaintiff successfully incited a group, consisting mostly of children, into an alleged counter-protest by provoking the children and young adults with bullhorns and taunts. (**Exhibit F**). The children responded by throwing plastic bottles and other debris at Plaintiffs from the crowd. (*Id*; **Exhibit I;** *most of the counter protesters engaged in assaultive or disruptive behavior were minors that were later released to their mothers*). While Plaintiff posits that they were attacked by a group of "angry Muslims" it is impossible to ascertain the religious affiliation of any of the counter protestors.

In any event, the Wayne County Sheriff's received numerous complaints from the protesters and counter-protesters regarding the continuing disturbance created by Plaintiffs. (**Exhibit I:** *WSCO Arab American Festival Post-Operation Report*)**.** Wayne County Sheriff's responded to the scene, reporting that,

> On Friday 06-15-2012, [Plaintiffs] attracted large crowds of people who were in a disagreement with their intentions. We were in a position to keep civil peace and protect all citizens from any potential altercation. We were able to k[eep] reasonable control of civil peace. As the crowd progress[ed] around the protesters to an unsafe level, we suggested to the protestors to leave the area immediately because public safety was being jeopardized. The crowd escalated to the level of throwing objects towards the protesters. Any subjects that were seen

throwing objects [were] immediately taken into custody. The protesters agreed to leave the festival. *Id; See also Exhibit F.*

In response to observations made at the scene, and consistent with Defendants policy of equal enforcement, Defendants made contact with those counter protesters engaging in assaultive or disruptive conduct as follows:

- Verbal warning given to subject: [redacted] DOB 06/07/01 for throwing bottle at protestors. Released to mother [redaction]. Cpl. Robert Landrum investigated.
- Out of Custody subject [redacted] DOB 07/18/95 [redacted] for assaulting protestors. Released to mother [redacted]. Capitan Khaled Sabbaugh is OIC in charge.
- Out of Custody to subject: [redacted] DOB 06/12/92 [redacted] for assaulting protestors (Bible Believers). Captain Khaled Sabbaugh is OIC in charge.
- Citation C-481526 issued to subject [redacted] DOB 12/12/90 for Disorderly Conduct (disturbing the peace). Threw bottle at protestors (Bible believers). Citation written by Sgt. Daniel Connel.
- Verbal warning given to Subject: [redacted] DOB 08/10/89 for Disorderly. When asked to leave protester's area from causing a disturbance, subject ignored reserve unit 3532. Unit 3532 attempted to escort subject from the area and subject yanked his arm away. (**Exhibit I:** *WSCO Arab American Festival Post-Operation Report).*

Despite making arrests and other efforts at quelling the mounting threat to public safety, Defendant Sheriff's Department observed the crowd progress to an unsafe level. (**Exhibit F**). At this time Plaintiff Israel was observed to have blood on his forehead, [Dkt. 1 ¶ 4], and he, along with the remaining Plaintiffs were asked to leave and safely escorted out of the Festival. (**Exhibit I**). Unlike the counter-protesters that were arrested, cited, charged, and prosecuted, Plaintiffs were simply asked to disperse. *Id*. Although the Festival continued for the next two days, Plaintiffs did not elect to return.

### 5.  The Complaint

Plaintiffs now bring a three (3) count complaint for alleged constitutional violations arising from the incident set forth above. (Count I: Freedom of Speech – First Amendment, Count II: Free Exercise of Religion, and Count III: Equal Protection – Fourteenth Amendment). [Dkt. 1].

Plaintiffs complaint fails as a matter of law because (1) Plaintiffs fail to meet the minimum pleading requirements of *Iqbal*, (2) Plaintiffs' claims are barred by the Doctrine of Qualified Immunity, (3) Plaintiff cannot establish *Monell* liability against Defendant Wayne County, and (4) Defendants actions were motivated by their concerns for public safety rather than the content of Plaintiffs' message.

## STANDARD OF REVIEW

In evaluating a motion to dismiss pursuant to Rule **12(b)(6)**, [c]ourts "must construe the complaint in the light most favorable to plaintiff," *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true[,]" id., and determine whether the "complaint states a plausible claim for relief[,]" Plaintiff must provide the grounds for its entitlement to relief, *Bovee v. Coopers & Lybrand* C.P.A., 272 F.3d 356, 361 (6th Cir. 2001), and that "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

Defendant's motion is also filed pursuant to **Fed. R. Civ. P. 56(c)**. Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v Catrett,* 477 U.S. 317, 322 (1986). *Martin v Ohio Turnpike Comm.,* 968 F.2d 606, 608 (6th Cir. 1992). In considering a

motion for summary judgment, the Court must review the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St .Corp. v Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987). A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir. 1993).

## STATEMENT OF LAW AND ARGUMENT

### I.   PLAINTIFFS FAIL TO MEET THE MINIMUM PLEADING REQUIREMENTS OF *US V IQBAL*.

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), [c]ourts "must construe the complaint in the light most favorable to plaintiff," *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true[,]" *Id*., and determine whether the "complaint states a plausible claim for relief[,]" *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). However, the plaintiff must provide the grounds for its entitlement to relief, *Bovee v. Coopers & Lybrand*, C.P.A., 272 F.3d 356, 361 (6th Cir. 2001), and that "***requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action.***" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (emph. added). A

plaintiff must ***"plead [ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*** *Iqbal*, 129 S. Ct. at 1949 (emph. added). A plaintiff falls short if they plead facts ***"merely consistent with a defendant's liability"*** ***or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct . . . ."*** *Id*. at 1949, 1950 (emph. added).

The complaint here does not meet the standard set forth in *Iqbal* because it alleges, in an entirely conclusory manner, that "Defendants" committed a constitutional violation. The complaint speaks in unacceptably general terms and offers no facts that would support a claim under any of the three theories advanced by Plaintiffs. See e.g. Dkt.. 1 at ¶ 74 ("At the time they were ordered to leave the Arab Festival under threat of arrest, Plaintiffs were engaged in speech activity that is protected by the First Amendment. Defendants' actions injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity. Plaintiffs' constitutionally protected activity motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent or motive.") This is not enough. See *Iqbal*, 129 S. Ct. at 1949 (2009) (***"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."***); *Bell Atlantic*, 550 U.S. at 555 (***explaining that the Court now "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action"***).

Plaintiff filed a three (3) count complaint asserting various theories under the First and Fourteenth Amendment. [Dkt. 1 ¶ 72 – 95]. Plaintiff has failed to meet the minimum pleading requirements of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Specifically, Plaintiff does not identify which "Defendants" engaged in the

allegations made within the counts of the Complaint. Rather Plaintiffs generically allege that "Defendants" took certain actions and caused certain damages, but Plaintiffs have not alleged any specific facts to support the conclusory allegation that "Defendants" violated their First or Fourteenth Amendment rights. Even construing the complaint generously, the allegations in Counts I, II, and III are so conclusory and insubstantial that they do not satisfy the *Iqbal* requirements.

In each and every count of Plaintiffs' complaint, Plaintiffs summarily raise all of their allegations against all Defendants generically in plural form. This defect is consistent and unmitigated. The complaint simply asserts that Defendants' conduct described elsewhere in the complaint was the direct and proximate cause of the Plaintiffs' (again, generically in plural form) of the alleged constitutional injury. Without more specific allegations, the Court and Defendants are at a loss to understand which of the actions specifically – and by which Defendants – form the basis of this action in Plaintiffs' view.

As argued at length *infra*, permitting Plaintiffs to amend their complaint to comply with the minimum pleading requirements would be futile because (1) Plaintiffs' claims are barred by the Doctrine of Qualified Immunity, (2) Plaintiff cannot establish *Monell* liability against Defendant Wayne County, and (3) Defendants actions were motivated by their concerns for public safety rather than the content of Plaintiffs' message.

## II.   DISMISSAL IS PROPER BECAUSE DEFENDANTS, AS GOVERNMENT OFFICIALS, ARE ENTITLED TO QUALIFIED IMMUNITY.

Government officials performing discretionary functions generally are shielded from liability for civil damages where their conduct does not violate established statutory or constitutional rights of which a reasonable person would have known. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir 1994); *Kurzawa v. Mueller*, 732 F.2d 1456 1458 (6th Cir. 1984). The issue of whether qualified immunity is applicable to an official's actions is a question of law. *Dickerson v. McCellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Qualified immunity "is an affirmative defense that is available to governmental officials performing discretionary functions." *Rich v. City of Mayfield Hts.*, 955 F.2dd 1092, 1094 (6th Cir. 1992). Once qualified immunity is asserted the burden of proof shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808; 172 L. Ed. 2d 565 (U.S. 2009) quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

The immunity is, "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).

To determine if qualified immunity attaches to an official's conduct, courts employ a multi-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In *Dunn v. Matatall*, 549 F.3d 348 (2008), the Sixth Circuit noted when reviewing claims of qualified immunity it employs a three-step inquiry:

First, we determine whether, based upon applicable law, the facts views in the light most favorable to the plaintiff . . . show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

In *Pearson* the U.S. Supreme Court reexamined this multi-step approach in *Saucier* and held:

We conclude that while the sequence set forth [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 555 U.S. at 223.

A court need not decide whether a constitutional violation has occurred ***if it finds the government officer's conduct was nevertheless reasonable***. *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010). The doctrine of qualified immunity "gives ample room for mistakes of judgment in ***protecting all but the plainly incompetent or those who knowingly violate the law***." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

1. ***The allegations, viewed in a light most favorable to the plaintiff do not show that a constitutional violation has occurred.***

Government regulation of speech is proper if the regulation is regarded as content neutral. *Ward v. Rock Against Racism,* 491 U.S. 781, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989). Regarding content-neutrality, "the principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (citation omitted). The controlling consideration is the government's purpose in enacting the regulation.

*Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

Courts often look to the operating orders or mission orders of law enforcement in deciphering the state-actor's intent. *Potts v. City of Lafayette*, 121 F.3d 1106, 1111-1112 (7th Cir. Ind. 1997). In *Potts* the court dismissed a similar claim after finding that, "[t]he operations order states that, with regard to the rally, 'the mission of the Lafayette Police Department is to prevent violence, protect persons at the rally, and protect property and businesses in the downtown Lafayette area while groups of differing viewpoints express their beliefs.'" *Id.* The order also stated that a plan for enforcing this mission was necessary because the rally was "expected to draw groups who oppose and support [the KKK's] cause who have been violent toward the KKK in the past, and who have been violent toward one another."

Likewise, in preparation for the Festival, Defendant issued its Operation Plan which commemorated intelligence reports, and Plaintiffs own concerns regarding the potential for violence at the festival. (**Exhibit E:** *Operations Plan – Arab American International Festival;* **Exhibit G:** *May 9, 2012 Correspondence*). In response Defendants adopted a policy that focused on public safety and was free of any prior restraint.

In the present case, there is nothing within the record suggesting that Defendants disagreed with the content of Plaintiffs' message. Instead, Defendant's Operation Plan was targeted at the "secondary effect" presented by "...the possibility that attendees who had been violent at previous rallies would injure themselves, others, or property--not at the content of the views aired at the rally." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 2005 U.S. Dist. LEXIS 38946, 12-13 (S.D. Ohio Dec. 30, 2005), "[c]ourts have recognized that, in an absence of

14

evidence that government agents disagree with the message of Plaintiffs, the government may protect against "the possibility that attendees who had been violent at previous rallies would injure themselves, others, or property.").

In *Glasson v. Louisville*, 518 F.2d 899, 909 (6th Cir. Ky. 1975), the Court held that, "...the law ***does not expect or require [law enforcement] to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection*** without having to respond in damages. Consistent with the holding in *Glasson*, supra, Plaintiffs were asked to leave for their own protection only after "public safety was being jeopardized." (**Exhibit I:** *WSCO Arab American Festival Post-Operation Report).*

Furthermore, there can be no legitimate dispute that municipalities have a substantial interest in maintaining public order and safety. *See e.g* <u>Cox v. New Hampshire</u>, 312 U.S. 569, 574, 61 S. Ct. 762, 85 L. Ed. 1049 (1941) (stating that the government may "impose regulations in order to assure the safety and convenience" of those using public forums). In the present case, Defendants' intent, as evidence by the Operations Plan and Post-Operation Report was a reasonable content neutral approach at preventing violence and injury at the Festival. (**Exhibit E** and **Exhibit I**).

"[T]here is large discretion under the police power to make instantaneous judgment calls based on the *de facto* situations to protect members of the public from their own conduct." <u>Potts</u>, *supra,* 121 F.3d 1106. In the present case, Defendants' judgment call in asking Plaintiffs' to

leave the festival was a precaution aimed at quelling increasing hostilities and not at all based upon the content of Plaintiffs' message. (**Exhibit F**).

While Plaintiffs are attempting to paint the 2012 Festival as collision between state imposed "sharia law" and Plaintiffs' First Amendment rights, nothing could be further from the truth. As stated above, the Festival is replete with examples of Christian and non-Muslim groups that peacefully engaged in expressing their message without interference by Defendants. The 2012 Festival was attended by Christian Aid Ministries, Merriman Baptist Church, Josh McDowel Ministry, Rivers of Life, Light & Life Arabic Free Methodist Church, and Impact International Ministries. (**Exhibit C:** *Artisan/Information Map*).

All such groups actively and peacefully conveyed their message during the entire course of the Festival without incident. These Christian groups preached for the entire three (3) day period of the Festival without creating a public safety issue. (in contrast Plaintiffs created a public safety issue in approximately 1 to 1 ½ hours). (**Exhibit F:** *Affidavit of Chief Deputy Sheriff D. Richardson).*

Defendants had reasonable cause to believe a threat to public safety existed at the time they made the dispersal order. Beyond the mounting violence evidenced by the multiple arrests and complaints of assault and battery, Plaintiffs themselves forecasted a violent clash in their May 9, 2012 correspondence, an assertion supported by ancillary intelligence. (**Exhibit G**; **Exhibit E:** *Operations Plan – Arab American International Festival at pg. 1, 2.0 Situation*). Accordingly, the decision to order dispersal was a content neutral reaction to the mounting threat to public safety.

**2.   *There is no precedential support for Plaintiffs' theory that the law required Defendants to assign them any number of officers to act as their personal security detail.***

The individual Defendant Officers are entitled to qualified immunity because Defendants' refusal to assign to Plaintiffs any number of officers did not violate clearly established law. A law enforcement officer is entitled to qualified immunity where clearly established law does not show that his conduct violated the constitution. *Anderson* v. *Creighton*, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson* v. *Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (internal quotation marks omitted); see *Hope* v. *Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

In their complaint, Plaintiffs allege that:

> It was clearly established on or about June 15, 2012, that Defendants had a constitutional duty not to ratify and effectuate a heckler's veto nor join a moiling mob of Muslims intent on suppressing speech. Instead, Defendants were required to take reasonable action to protect from violence persons exercising their constitutional rights, including Plaintiffs. By failing to do so, Defendants violated Plaintiffs' rights protected by the First Amendment. [Dkt. 1 at ¶ 76].

In a correspondence sent to Defendants by Plaintiff Israel on May 9, 2012, Plaintiff relies on two 6th Circuit decisions; (1) *Glasson v. Louisville*, 518 F.2d 899 (6th Cir. Ky. 1975), and (2) *Smith v. Ross*, 482 F.2d 33, 36-37 (6th Cir. Ohio 1973). In *Smith v Ross* the Court held that a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly. *Smith*, supra 482 F.2d 37.

*Glasson v Louisville*, held that a police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take **reasonable action** to protect from violence persons exercising their constitutional rights, including discharging their duty to remove a speaker for his own protection. *Glasson*, supra 518 F.2d 909. (emph. added).

Defendants are unaware of any precedent that would stand for the proposition that Defendants violated any clearly established constitutional rights by failing to assign to Plaintiff any number of law enforcement officers to act as Defendants' personal security detail. As emphasized immediately above, the crux of the inquiry in a "failure to protect" claim is the reasonableness of the defendants' actions. *Id*.

Here Defendants did apply the law equally, and ultimately in the interest of public safety, acted to protect Plaintiffs by escorting them out of the Festival. As a preliminary matter, Defendants assigned a reasonable number of officers to protect all attendees of the Festival (in fact the force was larger than Defendant's contributions to the World Series on the President); (**Exhibit F).** As argued above, Defendants made a number of arrests to the group of counter protesters. (**Exhibit I**). Based upon the collective experience of the deputies at scene, the crowd was reaching a critical mass that threatened public safety. At that point Defendants did act to protect Plaintiffs and made the discretionary judgment call to do so by escorting Plaintiffs from the scene. (**Exhibit F**).

### 3. *Notwithstanding, Defendants actions were "nevertheless reasonable."*

18

Accepting for the sake of argument that the restriction was content based, which it clearly was not, Defendants are nevertheless entitled to qualified immunity because Defendants actions, when viewed in context, were reasonable. In the present case, Plaintiffs alerted Defendants of their belief, and perhaps intention, that violence would accompany their expressive activity at the 2012 Festival. Defendants responded by providing the maximum available police force, and intervened only when the crowd progressed to an unsafe level.

Once qualified immunity is asserted, the burden of proof shifts to the Plaintiff to show that Defendants are not entitled to qualified immunity. *Sheets*, *supra* at 586. Because Plaintiffs are unable to meet the high burden required to defeat qualified immunity, the claims against Defendants should be dismissed.

## III.   DISMISSAL IS APPROPRIATE BECAUSE PLAINTIFFS CANNOT ESTABLISH *MONELL* LIABILITY; THAT THE ALLEGED ACTS EQUATE TO A "POLICY, PRACTICE, PROCEDURE AND/OR CUSTOM" OF DEFENDANT WAYNE COUNTY.

"Official capacity" claims against individual officers are recognized by the Court as claims against the municipal entity, not the individual officers, thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability as stated in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).

Municipal governments may only be sued under § 1983 for unconstitutional or illegal municipal policies, and not for unconstitutional conduct of their employees. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 819 (6th Cir. Ohio 2007)

19

Under *Monell*[5] a county may be held liable only (1), "when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy, inflicts the injury" *Id*. at 694, and (2) "[an] affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

The Supreme Court has further instructed that municipal liability will attach under § 1983 only where a policymaker was deliberately indifferent to the plight of citizens, evidenced by "a deliberate choice to follow a course of action … made from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 468, 483 (1986). **Proof of a single incident is insufficient**. *Id*.

*Monell* liability must be founded upon evidence that the government itself supported a violation of constitutional rights. *Bielevicz v. Dubinon*, 915 F.2d 845, 849-850 (3d Cir. 1990) (citing *Monell*). Before municipal liability will be imposed, a Plaintiff must prove that the municipality's alleged unconstitutional practices are "so widespread as to have the force of law." *Bryan County v. Brown, supra*, 520 U.S. at 404*; accord, Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). "[T]o be sure, 'official policy' often refers to formal rules or understandings

---

[5] *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978).

– often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id*. at 480-81

Plaintiffs have not alleged that any policy or custom of Wayne County caused a violation of their constitutional rights (i.e. beyond mere conclusory allegations which fail to meet the *Iqbal* standard, *supra*). Plaintiffs' complaint, at best, seems to allege that Defendants had a policy to restrict "Christian religious speech and expressive activities in the City of Dearborn." [Dkt 1, ¶ 1]. Plaintiffs "official capacity" claim against Defendant Jaffer and Richardson should be dismissed because Plaintiffs cannot recover for a single, isolated incident, nor did Defendants take similar action against peaceful Christian religious speech and expressive activities within the City of Dearborn. (i.e. there is no factual support to create an inference of such policy). As Plaintiffs are unable to establish a policy of Wayne County, the claim against Defendant Wayne County, and the official capacity claims against the individual officers should be dismissed.

## IV.    PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS EFFECTUATED A HECKLERS VETO WHERE DEFENDANTS TOOK A PRACTICAL AND EVEN HANDED APPROACH TO MAINTAINING PUBLIC SAFETY.

While true that there is a clearly established right to be free from prohibitions, restrictions and burdens on expression based solely on the heckler's veto, we must also be cognizant that "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965). Rather, governmental entities retain the right to regulate the use of public streets to protect legitimate government interests in maintaining public order and avoiding violence, *Id*. at

554-55, though in the case of content-based restrictions, such regulation must be narrowly drawn to serve compelling government interests. *Lefemine v. Wideman*, 672 F.3d 292, 299 (4th Cir. S.C. 2012).   See e.g. *Bering v. SHARE*, 106 Wn.2d 212, 721 P.2d 918, 935 (Wash. 1986) (upholding permanent injunction prohibiting anti-abortion protesters from using the words "murder," "kill," and their derivatives because state has "compelling interest in avoiding subjection of children to the physical and psychological abuse inflicted by the picketers' speech").

"The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction." *Poulos v. New Hampshire*, 345 U.S. 395, 405, 73 S. Ct. 760, 97 L. Ed. 1105 (1953). Indeed, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense &c. Fund*, 473 U. S. 788, 801 (105 SC 3439, 87 LE2d 567) (1985). Therefore, although the ability of the state to limit expressive activity in a traditional public forum is "sharply circumscribed," *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37 (1983), ***the state remains free to take action to maintain public order***. *Id*. It follows that although Plaintiffs cannot be excluded from the streets and sidewalks of Dearborn where the Festival took place, they are not free to create a disturbance or a threat to public safety.

Even in a traditional public forum, the government may impose content-neutral time, place, or manner restrictions provided that the restrictions "are justified without reference to the

content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (citation and internal quotations omitted). Thus, Defendants had the authority to regulate Plaintiffs' First Amendment activities where necessary. See *Wickersham v. City of Columbia*, 481 F.3d 591 (8th Cir. Mo. 2007) ("[Air show organizer-state actor] remains free to take reasonable steps to ensure that its air show message would not be submerged by any alternate forms of speech which prove to be unduly intrusive in their timing, place, or manner of expression.").

A state or municipality has the right to regulate the use of city streets "to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965).

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.

*Id.*; see also *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387, 89 S. Ct. 1794, 23 L. Ed. 2d 371 (1969) ("[T]he right of free speech . . . does not embrace a right to snuff out the free speech of others."). Thus, for instance, a municipality can control the use of its public streets for parades or processions, and it has similar authority "to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets." *Cox v. New Hampshire*, 312 U.S. 569, 576, 61 S. Ct. 762, 85 L. Ed. 1049 (1941). (See also, *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart*, 1991 U.S. App. LEXIS 11312 (4th Cir.

S.C. June 5, 1991), the court explained that the First Amendment did not forbid a state from preventing imminent lawless action; *Grider v. Abramson*, 180 F.3d 739, 743-44 (6th Cir. 1999) concluding that town's security plan developed in anticipation of KKK rally and counter-rally by opposing groups, in consultation with "the distilled essence of [other municipalities'] collective advice," was narrowly tailored to the government's interest in protecting the safety of both groups and the public; *Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. Pa. 2008), the court dismissed plaintiffs' First Amendment claim where video evidence showed that defendant speakers used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway).

In the present case, Plaintiffs created a public safety issue by, like the defendants in *Startzell*, using a bullhorn to create a disruption, which, here, culminated in a confrontation between Plaintiffs and a large group seemingly consisting mostly of children. Defendants responded by arresting a number of counter protesters and later escorted Plaintiffs from the festival for their own safety. (**Exhibit F; Exhibit I**). Plaintiffs could have obtained a booth. Plaintiffs could have elected to convey their message peacefully like every other group, including the numerous other Christian groups that use the festival as a platform to convey their religious message. However, Plaintiffs elected to pursue a course of conduct that quickly erupted into a public safety concern for Defendants. *Id*. When the public safety issue arose, Defendants made the decision to escort Plaintiffs away from the festival for their own safety. *Id*.

1. *Defendants' actions were not content or viewpoint based. Defendants' actions were motivated by public safety concerns.*

To determine if a restriction is content neutral, "[t]he principal inquiry . . . , in speech cases generally and in time, place, or manner cases in particular, is whether the government has

adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791. It is the government's purpose that controls. *Id*. A regulation is deemed content neutral if it serves purposes unrelated to the content of speech, regardless of whether it incidentally affects certain speakers or messages and not others. *Id*. That is, government regulation of speech is properly regarded as content neutral if it is "justified without reference to the content of the regulated speech." *Id*. (citation and internal quotations omitted) (emphasis in original).

In the present case, Plaintiffs argue that the police officers acted primarily because of concern with the crowd's reaction to their message, however, "the response to the plaintiffs was a response to context, not content." *Startzell*, *supra* at 6.

### i. Defendants had probable cause to disperse Plaintiffs.

In *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) the court upheld a District of Columbia ordinance as it applied to ongoing demonstrations of a political nature, which were creating a disturbance on the public streets and highways. The court stated that although political demonstrations are a form of protected expression, the First Amendment permits the police to contain or ***disperse*** demonstrations that have become violent or obstructive. *Id*. Specifically the Court held that where either obstructive conduct or actual or imminent violence infects a demonstration, the First Amendment did not insulate the demonstrators from being dispersed. 566 F.2d at 120, adopted by our circuit in *Leonardson v. East Lansing*, 896 F.2d 190, 197 (6th Cir. 1990).

## <u>CONCLUSION</u>

Plaintiffs' Complaint must be dismissed because it fails to meet the minimum pleading requirements of *Iqbal*. Plaintiffs' complaint here does not meet the standard set forth in *Iqbal* because it alleges, in an entirely conclusory manner, that "Defendants" (in generic plural form) committed a constitutional violation without indentifying which Defendants took which actions, against which Plaintiffs. Therefore, the Complaint gives insufficient notice to Defendants or to the Court from which to draw an inference with respect to liability.

Individually named Defendants Chief Deputy Jaafar and Richardson are entitled to Qualified Immunity. With respect to Qualified Immunity the relevant question in determining whether an official is entitled to qualified immunity is whether a reasonable person in his position could have believed his conduct to be lawful in light of clearly established law and the information the official possessed. *Ecclesiastical Order of the Ism of Am v. Chasin*, 845 F.2d 113, 117 (6th Cir. Mich. 1988). The law in this Circuit permits law enforcement officers to preserve the peace by removing a speaker for his own protection, *Glasson at* 909. However, no law supports Plaintiffs position that the Sheriff's Department was required to provide Plaintiffs with a personal security force for their sole protection and benefit.

Defendant Wayne County should be dismissed because Plaintiffs have failed to establish the *Monell* liability. While Plaintiffs make the conclusory allegation that a single event gives rise to the inference that Defendant Wayne County has a policy aimed at restricting "Christian religious speech and expressive activities in the City of Dearborn," the allegation is not supported by the evidence. Namely, Defendants made arrests of counter-protesters that were assaultive or disruptive and Defendants did not ask similarly situated, peaceful Christians engaged in expressive activity, to leave the Festival.

26

Plaintiffs' claims that Defendants effectuated a heckler's veto should be dismissed because ultimately the actions of Defendants were based upon a content neutral determination that public safety was being jeopardized. Defendants responded by arresting a number of counter protesters and later escorted Plaintiffs from the festival for their own safety.

**WHEREFORE**, Defendants respectfully request that this Honorable Court enter an Order **GRANTING** Plaintiff's Motion for Summary Judgment, or in the Alternative, Motion to Dismiss.

Respectfully Submitted,

NABIH H. AYAD & ASSOCIATES P.C.

Dated: January 24, 2013

/s/ Nabih H. Ayad

_____
Nabih H. Ayad
Attorney for Defendants
2200 Canton Center Rd., Ste 220
Canton, MI 48187
Phone: (734) 983-0500
Fax: (734) 983-0520

---

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on January 25, 2013:

☐ US MAIL    ☐ FAX    ☐ HAND DELIVERY    ☐ UPS    ☐ FEDERAL EXPRESS    ■ CM/ECF

/s/ Steven J. Ogilvie

_____
Steven J. Ogilvie

---

27