**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

BIBLE BELIEVERS; RUBEN CHAVEZ (a.k.a.
RUBEN ISRAEL); ARTHUR FISHER; and
JOSHUA DELOSSANTOS,

        Plaintiffs,

    v.

WAYNE COUNTY; BENNY N. NAPOLEON, in his
official capacity as Sheriff, Wayne County Sheriff's
Office; DENNIS RICHARDSON, individually and in
his official capacity as Deputy Chief, Wayne County
Sheriff's Office; and MIKE JAAFAR, individually
and in his official capacity as Deputy Chief, Wayne
County Sheriff's Office,

        Defendants.

No. 2:12-cv-14236-PJD-DRG

Hon. Patrick J. Duggan

---

AMERICAN FREEDOM LAW CENTER
Robert J. Muise, Esq. (P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756

David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
david.yerushalmi@verizon.net
(646) 262-0500
*Counsel for Plaintiffs*

ABIH H. AYAD & ASSOCIATES, P.C.
Abih H. Ayad (P59518)
2200 Canton Center Rd., Ste. 220
Canton, Michigan 48187
ayadlaw@hotmail.com
(734) 983-0500
*Counsel for Defendants*

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE
MOTION TO DISMISS & CROSS-MOTION FOR SUMMARY JUDGMENT**

---

## ISSUES PRESENTED

I.      Whether Plaintiffs' Complaint contains a short and plain statement of the claim showing that Plaintiffs are entitled to relief pursuant to Rule 8 of the Federal Rules of Civil Procedure.

II.     Whether Defendant Wayne County is liable for violating Plaintiffs' constitutional rights under 42 U.S.C. § 1983.

III.    Whether Defendants Richardson and Jaafar are entitled to qualified immunity for violating Plaintiffs' clearly established constitutional rights.

IV.     Whether Defendants' restriction on Plaintiffs' speech was content based in violation of the First Amendment.

V.      Whether Plaintiffs are entitled to summary judgment on their free speech, free exercise, and equal protection claims arising under the First and Fourteenth Amendments.

**CONTROLLING AND MOST APPROPRIATE AUTHORITY**

**Issue I:**  Whether Plaintiffs' Complaint states a claim showing that Plaintiffs are entitled to relief.

> *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
>
> *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
>
> *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)
>
> *Glasson v. Louisville*, 518 F.2d 899 (6th Cir. 1975)
>
> *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)
>
> Fed. R. Civ. P. 8(a)(2)

**Issue II:**  Whether Defendant Wayne County is liable for the constitutional violations.

> *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)
>
> *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)
>
> *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011)

**Issue III:**  Whether Defendants Richardson and Jaafar are entitled to qualified immunity.

> *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007)
>
> *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)
>
> *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)
>
> *Glasson v. Louisville*, 518 F.2d 899 (6th Cir. 1975)
>
> *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)

**Issue IV:**  Whether Defendants' restriction on Plaintiffs' speech activity was content based.

> *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)

**Issue V:**  Whether Plaintiffs are entitled to summary judgment on their constitutional claims.

> *Crobons v. Wis. Nat'l Life Ins. Co.*, 594 F. Supp. 379 (E.D. Mich. 1984)
>
> *Farmers Ins. Exchange v. Allstate Ins. Co.*, 143 F. Supp. 213 (E.D. Mich. 1956)

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)

*Glasson v. Louisville*, 518 F.2d 899 (6th Cir. 1975)

*Murdock v. Pa.,* 319 U.S. 105 (1943)

*Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92 (1972)

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)

Fed. R. Civ. P. 56(f)

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED...................................................................................................... i

CONTROLLING AND MOST APPROPRIATE AUTHORITY .................................. ii

TABLE OF CONTENTS................................................................................................ iv

TABLE OF AUTHORITIES ......................................................................................... vi

STANDARD OF REVIEW ............................................................................................1

      A.   Motion to Dismiss...........................................................................................1

      B.   Motion for Summary Judgment .....................................................................2

STATEMENT OF MATERIAL FACTS........................................................................4

I.     Plaintiffs' Free Speech Activity....................................................................4

II.    Defendants Agree to Be "Lead Law Enforcement Agency" at the Arab Festival.................5

III.   Dearborn Arab Festival: A Public Forum for Speech....................................................6

IV.   Plaintiffs' Free Speech Activity at the 2011 Arab Festival .....................................7

V.    Wayne County's Policy of Restricting Speech Based on the Listener's Reaction ................7

VI.   Plaintiffs' Free Speech Activity at the 2012 Arab Festival .....................................9

VII.  Defendants' Unconstitutional Restriction on Plaintiffs' Speech .........................................10

ARGUMENT ................................................................................................................13

I.     Plaintiffs Were Engaging in Constitutionally Protected Activity at the Arab Festival when Defendants Threatened to Arrest Them for Disorderly Conduct Based upon the Crowd's Reaction to their Speech in Violation of the First and Fourteenth Amendments .................13

      A.   Plaintiffs' Speech Activity Is Protected by the Free Speech and Free Exercise Clauses of the First Amendment ...............................................13

      B.   Defendants' Restriction on Plaintiffs' Speech Was Content Based in Violation of the First Amendment.....................................................................15

       C.     Defendants' Speech Restriction Violated the Equal Protection Clause........................18

II.     The County Is Liable for Violating Plaintiffs' Constitutional Rights...................................19

III.    Defendants Richardson and Jaafar Are Not Entitled to Qualified Immunity ......................22

CONCLUSION................................................................................................................................26

CERTIFICATE OF SERVICE .......................................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Albrecht v. Treon,*
617 F.3d 890 (6th Cir. 2010) ................................................................2

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,*
418 F.3d 600 (6th Cir. 2005) ..............................................................15

*Anderson v. Creighton,*
483 U.S. 635 (1987) ............................................................................22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..............................................................................2

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..............................................................................2

*Bennett v. MIS Corp.,*
607 F.3d 1076 (6th Cir. 2010) ..............................................................2

*Bd. of Educ. v. Mergens,*
496 U.S. 226 (1990)............................................................................14

*Boos v. Barry,*
485 U.S. 312 (1988)............................................................................17

*Cannon v. City & Cnty. of Denver,*
998 F.2d 867 (10th Cir. 1993) ............................................................22

*Cantwell v. Conn.,*
310 U.S. 296 (1940)............................................................................14

*Capitol Square Rev. & Adv. Bd. v. Pinette,*
515 U.S. 753 (1995) ............................................................................13

*Carey v. Brown,*
447 U.S. 455 (1980)............................................................................19

*Carey v. Piphus,*
435 U.S. 247 (1978)............................................................................25

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,*
477 F.3d 807 (6th Cir. 2007) ..............................................................26

*Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't,*
533 F.3d 780 (9th Cir. 2008) ............................................................16, 25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)............................................................................14

*City of Canton v. Harris,*
489 U.S. 378 (1989)............................................................................20

*Connick v. Thompson,*
131 S. Ct. 1350 (2011)........................................................................20

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
473 U.S. 788 (1985)............................................................................15

*Crobons v. Wis. Nat'l Life Ins. Co.,*
594 F. Supp. 379 (E.D. Mich. 1984).....................................................3

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998) ...........................................................................22

*Eckford-El v. Toombs,*
760 F. Supp. 12672 (W.D. Mich. 1991) .................................................3

*Edwards v. S.C.,*
372 U.S. 229 (1963)......................................................................16, 18

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975)............................................................................16

*Farmers Ins. Exch. v. Allstate Ins. Co.,*
143 F. Supp. 213 (E.D. Mich. 1956).....................................................3

*Floyd v. Laws,*
929 F.2d 1390 (9th Cir. 1991) ............................................................25

*Forsyth Cnty. v. Nationalist Movement,*
505 U.S. 123 (1992)......................................................................16, 25

*Frisby v. Schultz,*
487 U.S. 474 (1988)............................................................................15

*Glasson v. Louisville,*
518 F.2d 899 (6th Cir. 1975) .......................................................17, 22, 23

*Glik v. Cunniffe,*
655 F.3d 78 (1st Cir. 2011)..........................................................................13

*Hall v. Tollett,*
128 F.3d 418 (6th Cir. 1997) ......................................................................22

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ..............................................................................22, 23

*Hill v. Colo.,*
530 U.S. 703 (2000)....................................................................................13

*Lewis v. Wilson,*
253 F.3d 1077 (8th Cir. 2001) ....................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)......................................................................................3

*McDaniel v. Paty,*
435 U.S. 618 (1978).....................................................................................14

*Monell v. N.Y. City Dep't of Soc. Servs.,*
436 U.S. 658 (1978) ..........................................................................1, 19, 20

*Murdock v. Pa.,*
319 U.S. 105 (1943) ...............................................................................13, 14

*NAACP v. Claiborne Hardware, Co.,*
458 U.S. 886 (1982).....................................................................................18

*Parks v. City of Columbus,*
395 F.3d 643 (6th Cir. 2005) ......................................................................14

*Pearson v. Callahan,*
555 U.S. 223 (2009) ....................................................................................25

*Pembaur v. City of Cincinnati,*
475 U.S. 469 (1986).....................................................................................20

*Perry Educ. Ass'n v Perry Local Educators,*
460 U.S. 37 (1983).......................................................................................15

*Police Dep't of the City of Chicago v. Mosley,*
408 U.S. 92 (1972)...............................................................................18, 19

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ...................................................22

*Project Release v. Prevost*,
722 F.2d 960 (2d Cir. 1983)......................................................3

*Ragsdale v. Holder*,
668 F. Supp. 2d 7 (D.D.C. 2009) ..............................................4

*R.A.V. v .City of St. Paul*,
505 U.S. 377 (1992)..................................................................16

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)..................................................................16

*Saieg v. City of Dearborn*,
641 F.3d 727 (6th Cir. 2011) ........................................... *passim*

*Sandul v. Larion*,
119 F.3d 1250 (6th Cir. 1997) .................................................18

*Smith v. Ross*,
482 F.2d 33 (6th Cir. 1973) ...............................................25, 26

*Schneider v. N.J.*,
308 U.S. 147 (1939)..................................................................15

*Siderius, Inc. v. M.V. "Ida Prima"*,
613 F. Supp. 916 (S.D. N.Y. 1985)...........................................3

*Smoak v. Hall*,
460 F.3d 768 (6th Cir. 2006) ...................................................25

*Snyder v. Phelps*,
131 S. Ct. 1207 (2011)..............................................................16

*Street v. N.Y.*,
394 U.S. 576 (1969)..................................................................16

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949)................................................................17, 18

*Tx. v. Johnson*,
491 U.S. 397 (1989)..................................................................16

*United States v. Grace*,
461 U.S. 171 (1983).................................................................................................13

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).................................................................................................15

**<u>Rules</u>**

Fed. R. Civ. P. 8(a)(2)..............................................................................................2

Fed. R. Civ. P. 12(b)(6)............................................................................................1

Fed. R. Civ. P. 12(c)................................................................................................2

Fed. R. Civ. P. 56(a)................................................................................................2

Fed. R. Civ. P. 56(f)..............................................................................................1, 3

**Statutes**

42 U.S.C. § 1983 ................................................................................... *passim*

## INTRODUCTION

Defendants Wayne County, Benny N. Napoleon, Dennis Richardson, and Mike Jaafar ("Defendants") seek to dismiss Plaintiffs' lawsuit on multiple grounds. First, Defendants claim that the court should dismiss Plaintiffs' Complaint pursuant to "Rule 12(b)(6)" for failing "to meet the minimum pleading requirements." (Defs.' Br. at 9-11). Second, Defendants claim that "dismissal is proper because Defendants, as government officials, are entitled to qualified immunity." (Defs.' Br. at 11-19). Third, Defendants claim that "dismissal is appropriate because Plaintiffs cannot establish *Monell* liability." (Defs.' Br. at 19-21). And finally, Defendants claim that "Plaintiffs cannot establish that Defendants effectuated a hecklers['] veto where Defendants took a practical and even handed approach to maintaining public safety." (Defs.' Br. at 21-25). Defendants are mistaken on all counts. Indeed, in light of the undisputed material facts, Plaintiffs are entitled to judgment as a matter of law on their free speech, free exercise, and equal protection claims. *See* Fed. R. Civ. P. 56(f) (permitting the court to "grant summary judgment for a nonmovant"). At a minimum, Defendants' motion should be denied.[1]

## STANDARD OF REVIEW

### A. Motion to Dismiss.

Defendants assert that their motion to dismiss for failure to state a claim arises under Rule 12(b)(6) of the Federal Rules of Procedure. (Defs.' Mot. at 9). However, a Rule 12(b)(6) motion "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Here, Defendants filed an answer, thereby closing the pleadings. (Answer [Doc. No. 8]). Consequently, Plaintiffs will treat Defendants' motion as if it were made under Rule 12(c) of the Federal Rules of

---

[1] Indeed, should the court not grant judgment in Plaintiffs' favor, Plaintiffs are entitled to a preliminary injunction while this case proceeds through discovery and will be filing such a motion prior to the 2013 Arab Festival scheduled for this June.

Civil Procedure.  *See* Fed. R. Civ. P. 12(c) (permitting a motion for judgment on the pleadings "after the pleadings are closed").  In reviewing a Rule 12(c) motion, the court employs the same standard as when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010).  That is, the court must accept the well-pled allegations in the Complaint as true and construe each of them in the light most favorable to Plaintiffs.  *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010).  To survive the motion, the Complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To meet this standard, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Albrecht*, 617 F.3d at 893.  In essence, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Plaintiffs' Complaint easily satisfies this standard.[2]  Consequently, Defendants' motion to dismiss should be denied.  Indeed, as demonstrated further below, the parties' submissions make clear that there is no genuine issue as to any material fact such that *Plaintiffs* are entitled to judgment as a matter of law on their constitutional claims.

###### B.  Motion for Summary Judgment.

"The court shall grant summary judgment if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, when reviewing Defendants' motion, this court must view the evidence, all facts, and inferences that

---

[2] Defendants' objection to the Complaint reads more like a motion for a more definite statement under Rule 12(e).  However, that cannot be the case since a party making such a motion must claim that the Complaint "is so vague or ambiguous that the party cannot reasonably prepare a response" thus "[t]he motion must be made before filing a responsive pleading."  Fed. R. Civ. P. 12(e).  As noted, Defendants already filed their Answer.

may be drawn from the facts in the light most favorable to Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Moreover, "[a]fter giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f). Indeed, "[m]aking of a motion for summary judgment exposes the moving party to the risk that summary judgment will be granted against him, if the submissions make clear that there is 'no genuine issue as to any material fact and that the [adverse] party is entitled to judgment as a matter of law.'" *Siderius, Inc. v. M.V. "Ida Prima"*, 613 F. Supp. 916, 923 (S.D. N.Y. 1985); *see also Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir. 1983) (stating that a trial court "may grant summary judgment to a non-moving party, if no genuine issues of material fact have been shown"); *Crobons v. Wis. Nat'l Life Ins. Co.*, 594 F. Supp. 379, 380 (E.D. Mich. 1984) ("Once a court has made such an adverse determination to the moving party on a motion for summary judgment brought under Rule 56, and its determination is supported by the admissible evidence presented by the party opposing the motion, summary judgment in favor of that party is appropriate even though it has not brought a cross-motion for summary judgment."); *Farmers Ins. Exch. v. Allstate Ins. Co.*, 143 F. Supp. 213, 215 (E.D. Mich. 1956) ("Although defendant has not moved for summary judgment, the better practice is to grant summary judgment for the non-moving party if it is entitled thereto."); *Eckford-El v. Toombs*, 760 F. Supp. 1267, 1272 (W.D. Mich. 1991) ("Accordingly, as defendants invoked the power of the court to render summary judgment against plaintiff, it is reasonable for the court to render summary judgment for plaintiff, as the undisputed facts clearly warrant that result.").

Here, the undisputed material facts demonstrate that Plaintiffs are entitled to judgment as a matter of law on their constitutional claims. Defendants seek to avoid this inevitable conclusion by submitting to this court a materially false and misleading affidavit in which Defendant Richardson claimed that "Deputies *asked* Plaintiffs that they leave the immediate area *for their own safety* and

they were then escorted away from the counter protestors by my deputies." (Defs.' Br., Ex. F [Doc. No. 13-6]) (emphasis added). The video evidence submitted in support of Plaintiffs' opposition / cross-motion demonstrates *without dispute* that Defendant Richardson ultimately *ordered* Plaintiffs to cease their constitutionally protected free speech activity and leave the Arab Festival *under threat of arrest for disorderly conduct*. (Israel Decl. at ¶¶ 29-30, Ex. B [Chapter 4], at Ex. 1). And this order was issued based on the crowd's response to the content of Plaintiffs' speech, (Israel Decl. at ¶¶ 18-19, 27-30, Ex. B [Chapters 1 & 4], at Ex. 1), in violation of the Constitution.

In sum, the undisputed material facts and controlling law compel this court to deny Defendants' motion and enter judgment in Plaintiffs' favor on their free speech, free exercise, and equal protection claims as a matter of law—"the undisputed facts clearly warrant that result."

## STATEMENT OF MATERIAL FACTS[3]

## I. Plaintiffs' Free Speech Activity.

Plaintiff Bible Believers is an unincorporated association of individuals who share and express their Christian faith with others, including Muslims, through free speech activities, including street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes. Bible Believers has over 60 chapters nationwide, and Plaintiffs Israel,[4] Fisher, and DeLosSantos are members of the organization. (Israel Decl. at ¶ 3 at Ex. 1; Compl. at ¶¶ 6-9).

---

[3] Aside from Defendant Richardson's affidavit (Defs.' Br., Ex. F [Doc. No. 13-6]), Defendants failed to authenticate the documents submitted in their motion. *See Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16 (D.D.C. 2009) ("[T]o be considered for or against summary judgment, a document must be authenticated, either by an affidavit that meets the requirements of Rule 56(e) [of the] Federal Rules of Civil Procedure, or in accord with the Federal Rules of Evidence. Indeed, for the Court to accept anything less would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.") (internal punctuation and citations omitted). Consequently, Plaintiffs object to Defendants' Exhibits A, B, C, D, G, and J. However, Plaintiffs do not object to Defendants' Exhibits E, H, or I on these grounds.
[4] Plaintiff Israel's legal name is Ruben Chavez. However, he is commonly known as Ruben Israel, and will be referred to in this brief and throughout this litigation as Plaintiff Israel.

Plaintiff Israel is a travelling Christian evangelist who, based upon his sincerely held religious beliefs, shares and expresses his Christian faith with others, including Muslims, through free speech activities, which include street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes.  Plaintiff Israel was the leader and spokesperson for a group of Christian evangelists that attended the Arab Festival held in Dearborn, Michigan in June 2011 and again in June 2012.  Plaintiff Israel engaged in his speech activity at each Arab Festival as a member of Bible Believers.  (Israel Decl. at ¶¶ 1-4 at Ex. 1; Compl. at ¶ 7).

## II.    Defendants Agree to Be "Lead Law Enforcement Agency" at the Arab Festival.

Defendant Wayne County is a charter county existing under the laws of the State of Michigan, Defendant Benny N. Napoleon is the Wayne County Sheriff, and Defendants Dennis Richardson and Mike Jaafar are Deputy Chiefs with the Wayne County Sheriff's Office.  (Answer at ¶¶ 10-13 [admitting facts]).

On or about June 2, 2011, the City of Dearborn entered into an agreement with the Wayne County Sheriff's Office, which was acting on behalf of Defendant Wayne County, in which "[t]he Wayne County Sheriff's Department [agreed to] be the lead law enforcement agency within the perimeter of the [Arab] Festival" (hereinafter "Agreement").  The Agreement was signed on behalf of Defendant Napoleon.  (Answer at ¶ 28 [admitting facts]).  The American Arab Chamber of Commerce, which is responsible for organizing the Arab Festival, was also a party to the Agreement. (Muise Decl. at ¶ 3, Ex. A, at Ex. 2).  Per the Agreement, the Arab Festival was conducted pursuant to, *inter alia*, the "rules and regulations" of the [American Arab Chamber of Commerce] and the Wayne County Sheriff's Department."  (Muise Decl. at ¶ 3, Ex. A, at Ex. 2).  Similarly, the Wayne County Sheriff's Office was the lead law enforcement agency at the 2012 Arab Festival, and its stated mission was "to provide Wayne County citizens, festival patrons, organizers, [and] merchants

with law enforcement presence and to ensure the safety of the public, and keep the peace in the event there is a disturbance."  (Defs.' Br., Ex. E [Doc. No. 13-5]).

### III.     Dearborn Arab Festival: A Public Forum for Speech.

For the past seventeen years, the Arab Festival was held in Dearborn, Michigan.  The 17th Annual Arab Festival was held from Friday, June 15, 2012 to Sunday, June 17, 2012.  (Answer at ¶ 17 [admitting facts]).  The Arab Festival takes place on the city streets in Dearborn.  At various points, barriers are erected to separate the sidewalks from the festival, which is a street festival held mostly on Warren Avenue.  (Israel Decl. at ¶¶ 6-7 at Ex. 1; Compl. at ¶¶ 17-18).

The public sidewalks along Warren Avenue retain their character as a public forum during the Arab Festival.  *See Saieg v. City of Dearborn*, 641 F.3d 727, 737-41 (6th Cir. 2011) (striking down speech restriction at Arab Festival on First Amendment grounds).  (Compl. at ¶¶ 19-20, 27).  The Agreement, to which Defendant Wayne County is a party, acknowledged this fact, observing that the Sixth Circuit "held that because the Festival is not cordoned off, nor is a fee charged for entry, and because people may use the public sidewalks to access the businesses that remain open during the Festival, that free speech in the form of leafleting on the public sidewalks within the Festival is permitted."  (Muise Decl. at ¶ 3, Ex. A at Ex. 2; *see also* Israel Decl. at ¶¶ 6-7 at Ex. 1).

Pursuant to the Sixth Circuit's opinion in *Saieg v. City of Dearborn*, on June 14, 2011, the U.S. District Court for the Eastern District of Michigan entered a judgment in *Saieg v. City of Dearborn*, Case No. 09-12321, that included the following injunction: "the Court hereby invalidates and permanently enjoins Defendants, their officers, agents, servants, employees, and attorneys and any other persons who are in active concert or participation with them, *including the Wayne County Sheriff's Department* and the American Arab Chamber of Commerce, from enforcing the leafleting restriction as set forth in the Opinion of the Sixth Circuit."  (emphasis added).  Defendant Napoleon,

through counsel, was served with the judgment and injunction on June 15, 2011.  (Muise Decl. at ¶ 4, Ex. B at Ex. 2; Compl. at ¶¶ 29-30).

## IV.     Plaintiffs' Free Speech Activity at the 2011 Arab Festival.

On or about June 17, 2011, Plaintiff Israel and several other members of Bible Believers, including Plaintiffs Fisher and DeLosSantos, attended the Arab Festival.  When they arrived with their Christian signs, banners, and t-shirts, Wayne County deputies directed them to a "free speech zone," which was a confined area surrounded by barricades.  (Israel Decl. at ¶ 9 at Ex. 1; Compl. at ¶ 31).

Plaintiff Israel and his fellow Christians returned to the Arab Festival on Sunday, June 19, 2011, and Wayne County deputies told Plaintiff Israel that they were not going to provide the barricaded "free speech zone."  As a result, the Christians walked along the public sidewalks, expressing their Christian message.  (Israel Decl. at ¶ 10 at Ex. 1; Compl. at ¶ 32).

While Plaintiffs were expressing their message, a confrontation ensued with irate Muslims who objected to the message.  Wayne County deputies moved in after the confrontation died down and seized one of the Christians.  The deputies apprehended the Christian, and Defendant Jaafar paraded him past the angry Muslims while they cheered.  (Israel Decl. at ¶ 11 at Ex. 1; Compl. at ¶ 33).

## V.     Wayne County's Policy of Restricting Speech Based on the Listener's Reaction.

Plaintiffs returned to Dearborn the following year on or about June 15, 2012.  Prior to doing so, Plaintiff Israel, through counsel, sent a letter on or about May 9, 2012 to Defendant Napoleon and Robert A. Ficano, the Wayne County Executive, informing them that he would be attending the Arab Festival once again "to peacefully share his Christian beliefs with others, including Muslims, who attend the festival."  The letter further informed Defendants that "[i]n the past, Israel and a few

friends have attempted to engage in peaceful expression at this festival.  But upon sharing their Christian beliefs, certain Muslims began physically assaulting Israel and his friends.  When Israel and his friends asked for help from police officers with the Wayne County Sheriff's Department, the officers took the side of the violent Muslims and ordered Israel and his friends to stop their expression."  (Israel Decl. at ¶¶ 12-13, Ex. A, at Ex. 1; Compl. at ¶¶ 34-35).

The County acknowledged receipt of Plaintiffs' letter and, through its "Corporation Counsel," responded on or about June 14, 2012.[5]  (Defs.' Br., Ex. H [Doc. No. 13-8]).  In its official response, the County set forth its policy that applied to Plaintiffs' expressive conduct, stating, *inter alia*, that "individuals can be held criminally accountable for conduct which has the tendency to incite riotous behavior or otherwise disturb the peace" and that the County "cannot protect everyone from the *foreseeable consequences* that come from speech *that is designed and perhaps intended to elicit a potentially negative reaction*."  (Defs.' Br., Ex. H [Doc. No. 13-8]) (emphasis added).  The Corporation Counsel also stated the policy of the County with regard to how it would respond to a situation in which a crowd reacts negatively toward a speaker, claiming that law enforcement may "discharge their duty of preserving the peace by intercepting [the speaker's] message or by removing the speaker. . . ."  (Defs.' Br., Ex. H [Doc. No. 13-8]).

In addition to the Corporation Counsel's statements, in the "Operations Plan" for the 2012 Arab Festival, which was dated June 7, 2012 and sent from Defendant Jaafar to Defendant Napoleon "(through channels)," Defendants pejoratively referred to Plaintiff Bible Believers as "a radical group" that will "show up at the festival trying to provoke our staff in a negative manner and attempt to capture the negativity on video camera."  (Defs.' Br., Ex. E [Doc. No. 13-5]).

---

[5] Ms. Darnella Williams, "Counsel to Sheriff Benny N. Napoleon," was copied on the letter.  (Defs.' Br., Ex. H [Doc. No. 13-8]).

In short, it is the policy of the County, which agreed to be the lead law enforcement agency for the Arab Festival, that if a "radical group" of protestors is engaging in speech that is causing a crowd to react negatively, the peaceful protestors may be held criminally accountable for disturbing the peace—which is precisely what happened in this case. (*See also* Compl. at ¶¶ 10-15, 65, 75-78, 86, 91 [setting forth Defendants' policy of effectuating a "heckler's veto"]).

## VI.    Plaintiffs' Free Speech Activity at the 2012 Arab Festival.

On or about June 15, 2012, Plaintiffs and their Christian companions went to the Warren Avenue area where the Arab Festival was taking place and wore t-shirts and carried signs and banners expressing their Christian message.  Plaintiffs peacefully engaged in their expressive activity along the public sidewalks and other public areas where pedestrian traffic was permitted.  (Israel Decl. at ¶¶ 14-17 at Ex. 1; Compl. at ¶¶ 37-42).

During Plaintiffs' expressive activity, Plaintiff Israel wore a t-shirt with the message, "Fear God" on the front and "Trust Jesus, Repent and Believe in Jesus" on the back.  Plaintiff Fisher wore a t-shirt with the message, "Trust Jesus" on the front and "Fear God and Give Him Glory" on the back, and he carried a banner that said on one side, "Only Jesus Christ Can Save You From Sin and Hell," and on the other side it said, "Jesus Is the Judge, Therefore, Repent, Be Converted That Your Sins May Be Blotted Out."  Plaintiff Fisher also carried a small, hand-held camera to record the event.  Plaintiff DeLosSantos accompanied Plaintiffs and joined in their free speech activity.  (Israel Decl. at ¶ 16 at Ex. 1; Compl. at ¶¶ 43-44).

Other messages conveyed on t-shirts, signs, or banners that accompanied Plaintiffs included, among others, "Fear God," "Trust Jesus, Repent and Believe in Jesus," "Prepare to Meet Thy God – Amos 4:12," "Obey God, Repent," "Turn or Burn," "Jesus Is the Way, the Truth and the Life.  All

Others Are Thieves and Robbers," and "Islam Is A Religion of Blood and Murder." (Israel Decl. at ¶ 17 at Ex. 1; Compl. at ¶ 45).

While Plaintiffs and their companions were walking along the public sidewalks and expressing their messages, they were assaulted by a group of Muslims, which consisted mostly of teenagers.[6] Adult bystanders were encouraging the Muslim youths, who were throwing bottles, rocks, and other debris at the Christians. The Muslims were also shouting and blowing horns to harass the Christians. Some of the Muslims spat at the Christians. Several Christians, including Plaintiff Israel, were bruised and bloodied by the assault. The Muslims also shouted profanities at the Christians and mocked the Christians' faith. The Christians responded by simply holding up their hands to avoid being falsely accused of acting aggressively toward their Muslim attackers. (Israel Decl. at ¶¶ 18-20, Ex. B [Chapter 1], at Ex. 1; Compl. at ¶¶ 46-48).

When Wayne County deputies appeared at the scene of the Muslim violence, the Muslims would momentarily halt their attack, only to resume it once the deputies departed. (Israel Decl. at ¶ 21, Ex. B [Chapter 2], at Ex. 1; Compl. at ¶ 49). The Muslims did not attack the Wayne County deputies; they only attacked the Christians. (Israel Decl., Ex. B [Chapters 1 & 2] at Ex. 1).

## VII.   Defendants' Unconstitutional Restriction on Plaintiffs' Speech.

Shortly upon Plaintiffs' arrival at the Arab Festival and continuing for approximately the first hour while they were expressing their message, Defendant Jaafar was repeatedly telling Defendant Richardson that Plaintiffs need to be removed and that he (Defendant Richardson) needs to do something about it. (Israel Decl. at ¶ 22 at Ex. 1; Compl. at ¶ 50).

---

[6] It was evident to Plaintiffs that the violent counter-protestors were Muslim by what they were saying and how they were reacting to Plaintiffs' messages. (Israel Decl. at ¶ 19, Ex. B [Chapter 1 & 3], at Ex. 1).

Approximately 30 minutes later, Defendant Jaafar confronted Plaintiff Israel, and in an angry manner told him that the deputies were not going to protect him or his fellow Christians.   Defendant Jaafar told Plaintiff Israel that he and his fellow Christians had "the option to leave."   Plaintiff Israel responded to Defendant Jaafar, telling him that Defendants had the option "to stand with us."   Defendant Jaafar did not respond.   Instead, he abruptly departed.[7]   (Israel Decl. at ¶¶ 23-24, Ex. B [Chapter 3] at Ex. 1; Compl. at ¶¶ 51-52).

Moments after Defendant Jaafar departed, Defendant Richardson took over and escorted Plaintiff Israel to the side to discuss the matter.   With blood dripping from his forehead as a result of the Muslim attacks, Plaintiff Israel pleaded with Defendant Richardson to assign just two Wayne County deputies to stand with the Christians during their speech activity, noting that when uniform officers are present, the Muslims stop their criminal assault.   Defendant Richardson refused.   (Israel Decl. at ¶¶ 25-26, Ex. B [Chapter 4], at Ex. 1; Compl. at ¶¶ 56-57).

While speaking with Plaintiff Israel, Defendant Richardson criticized Plaintiffs for their speech, motioning toward the Christians and stating, "Look at your people here.   Look it, look it. This is crazy."   (Israel Decl. at ¶ 27, Ex. B [Chapter 4], at Ex. 1; Compl. at ¶58).

At one point, Deputy Chief Richardson stepped away from the conversation for a moment and was seen consulting with Ursula Henry, Director of Legal Affairs for the Wayne County Sheriff's Office.   (Israel Decl. at ¶ 28, Ex. B [Chapter 4], at Ex. 1).   After consulting with Ms. Henry, Defendant Richardson returned and gave Plaintiffs an ultimatum: *Plaintiffs could either leave the Arab Festival or they would be criminally cited and arrested for disorderly conduct*.   Defendant

---

[7] Defendant Jaafar, a Muslim, was featured in the now-cancelled show, "All American Muslim," which appeared on The Learning Channel (TLC).   (Answer at ¶ 53 [admitting facts]).   In a 2012 televised segment of "All American Muslim," Defendants Jaafar and Richardson were on camera discussing the 2011 Arab Festival.   During this conversation, Defendants Jaafar and Richardson discussed Plaintiffs' signs and banners, describing Plaintiffs' message as "offensive."   (Israel Decl. at ¶ 35 at Ex. 1; Compl. at ¶¶ 53-55, 65).

Richardson stated, "If you don't leave we are going to cite you for disorderly."  This conversation was captured on video.  (Israel Decl. at ¶¶ 27-29, Ex. B [Chapter 4], at Ex. 1; Compl. at ¶¶ 58-59).

To avoid being cited and arrested by Defendants, Plaintiffs ceased their free speech activity and departed the area.  (Israel Decl. at ¶ 30, Ex. B [Chapter 4], at Ex. 1; Compl. at ¶ 60).

While Defendants could not spare just two deputies to allow Plaintiffs to engage in their peaceful speech activity, more than a dozen deputies arrived at the scene to ensure that Plaintiffs ceased their activity and departed the area under threat of arrest.  (Israel Decl. at ¶ 31, Ex. B [Chapter 5], at Ex. 1; Compl. at ¶ 61).

Defendants' actions drew cheers from Muslim onlookers who were involved in the violent attacks.  However, at no time did Plaintiffs observe the Wayne County deputies arresting the Muslim attackers and taking them away in handcuffs[8]—an action that would have quieted the crowd and permitted Plaintiffs to continue their free speech activity without interference.  (Israel Decl. at ¶ 32 at Ex. 1; Compl. at ¶¶ 62-63).

Shortly after departing the Arab Festival in their van, more than a dozen law enforcement officers were available to pull over Plaintiffs, conduct a traffic stop, and issue the driver a traffic citation—the citation was issued by a Wayne County deputy.  The citation was issued because Plaintiffs had removed the license plate from their van for security reasons—they did not want their

---

[8] According to Defendants' "Post-Operation Report," Defendants issued only *one* citation for disturbing the peace, gave only *three verbal* warnings, and briefly detained *two* other individuals. (Defs.' Br., Ex. I [Doc. No. 13-9]).  Yet, Defendants had thirty-four (34) deputies and nineteen (19) reserve officers on the scene, and this force included a mounted unit with six (6) horses.  (Defs.' Br. at 3).  Moreover, according to Defendants' report, only two of these individuals—the one who received the citation and one who was temporarily detained—were associated with Plaintiffs (*i.e.*, the report identifies them as related to "(Bible Believers)").  (Defs.' Br., Ex. I [Doc. No. 13-9]). There were no official arrests indicated, confirming what Defendant Jaafar had told the local press. (*See* Israel Decl. at ¶ 33 at Ex. 1).

vehicle to be identified by any of the hostile counter-protestors as they were leaving the Arab Festival area.  (Israel Decl. at ¶ 34, Ex. B [Chapter 6] at Ex. 1).

Plaintiffs want to return to Dearborn during the Annual Arab Festival in June 2013 to engage in their free speech activity.  However, they fear that if they do return, they will again be attacked by Muslims and forced to leave under the threat of arrest for disorderly conduct.  (Israel Decl. at ¶ 36 at Ex. 1).

## ARGUMENT

I.   **Plaintiffs Were Engaging in Constitutionally Protected Activity at the Arab Festival when Defendants Threatened to Arrest Them for Disorderly Conduct Based upon the Crowd's Reaction to their Speech in Violation of the First and Fourteenth Amendments.**

A.   **Plaintiffs' Speech Activity Is Protected by the Free Speech and Free Exercise Clauses of the First Amendment.**

It cannot be gainsaid that Plaintiffs were engaging in constitutionally protected speech activity at the Arab Festival when Defendants threatened to arrest them for disorderly conduct based upon the crowd's reaction to the content of Plaintiffs' message.  Conveying a religious message with signs, as Plaintiffs were doing here, is protected speech under the First Amendment.[9]  *See Hill v. Colo.*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."); *United States v. Grace*, 461 U.S. 171, 176-77 (1983) (demonstrating with signs constitutes protected speech under the First Amendment); *see also Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[Religious expression] is as fully protected under the Free Speech Clause as secular private expression."); *Murdock v. Pa.,* 319 U.S. 105, 110 (1943) (holding that "spreading

---

[9] Plaintiffs' right to videotape at the Arab Festival is also fully protected by the First Amendment. *See Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he videotaping of public officials is an exercise of First Amendment liberties."). (*See* Defs.' Br., Ex. E [Doc. No. 13-5] [complaining that Plaintiff Bible Believers is one of the "groups" that will "show up at the festival trying to provoke [Wayne County Sheriff's Office] staff in a negative manner and attempt to capture the negativity on video camera"]).

one's religious beliefs" and "preaching the Gospel" are constitutionally protected activities).

Plaintiffs' expressive activity is also protected by the Free Exercise Clause. *See id.*; *see also Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (O'Connor, J.) ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect."). The right to free exercise of religion embraces two concepts: the freedom to believe and the freedom to act. *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940). Under the First Amendment, the government may not impose special restrictions, prohibitions, or disabilities on the basis of religious beliefs. *See McDaniel v. Paty*, 435 U.S. 618 (1978). "The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." *Id*. at 626. Indeed, "[t]he principle that government may not enact laws that suppress religious belief or practice is . . . well understood." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993); *see also id*. at 534 (holding that the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs") (quotations and citations omitted). And "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id*.

Moreover, Plaintiffs do not surrender their constitutional rights because an Arab festival is taking place on the public streets. *See Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) (striking down on First Amendment grounds the literature distribution policy enforced by City police at the Arab Festival); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (holding that the city's "streets remained a traditional public forum" in a case striking down a restriction on the plaintiff's right to distribute religious literature on the city's streets, "notwithstanding the special permit that was issued to the Arts Council" to use the streets for the Columbus Arts Festival, which

was open to the public); *see also Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988) ("[O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a 'cliché,' but recognition that wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public.  No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.") (internal quotations and citation omitted); *Schneider v. N.J.*, 308 U.S. 147, 163 (1939) ("[T]the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").  And in a public forum, such as a city street or sidewalk, the government's ability to restrict speech is sharply limited.  *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985) ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) (striking down city ordinance and stating, "Constitutional concerns are heightened further where, as here, the [challenged ordinance] restricts the public's use of streets and sidewalks for political speech"); *see also Perry Educ. Ass'n v Perry Local Educators*, 460 U.S. 37, 55 (1983) ("[I]in a public forum . . . all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers. . . .").

Defendants' restriction on Plaintiffs' speech does not meet this high threshold.

### B. Defendants' Restriction on Plaintiffs' Speech Was Content Based in Violation of the First Amendment.

While the government may impose *content-neutral* time, place, and manner restrictions on speech in a public form, *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989); *see also Saieg*,

641 F.3d at 735; "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v .City of St. Paul*, 505 U.S. 377, 391 (1992). And the Supreme Court has held time and again that the mere fact that someone might take offense at the content of the speech or the viewpoint of the speaker does not provide a basis for prohibiting the speech. *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. Indeed, the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.") (citations and quotations omitted); *Tx. v. Johnson*, 491 U.S. 397, 414 (1989) (same); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) ("[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."); *Street v. N.Y.*, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Edwards v. S.C.*, 372 U.S. 229, 237 (1963) ("The Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views.").

Furthermore, it is a clearly established principle of First Amendment jurisprudence that *a listener's reaction to speech is not a content-neutral basis for regulation*. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). "The First Amendment knows no heckler's veto." *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780 790 (9th Cir. 2008) (noting that there is no "minors" exception to the

16

heckler's veto).  And while restrictions on speech because of the "secondary effects" that the speech creates are sometimes permissible, an effect from speech is not secondary if it arises from the content of the speech.  Consequently, "[t]he emotive impact of speech on its audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.).  Thus, in *Glasson v. Louisville*, 518 F.2d 899, 906 (6th Cir. 1975), the Sixth Circuit described the proper police response when faced with a situation in which an angry mob of hecklers opposes a speaker's message: "A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas.  Instead, he must take reasonable action to protect . . . persons exercising their constitutional rights."

Here, ordering Plaintiffs to halt their constitutionally protected activity *under threat of arrest for disorderly conduct* rather than halting the actual criminal and disorderly conduct of the "moiling mob" is <u>not</u> a constitutionally permissible response by Defendants.  Rather, the proper (and constitutional) response would have been to <u>arrest the counter-protesters, *en masse* if necessary</u>— particularly in light of the large number of officers (which included a mounted unit) that were available.  In short, Defendants' actions empowered the hecklers and censored Plaintiffs' speech in direct violation of the First Amendment.[10]

Indeed, controlling precedent leaves no doubt that Plaintiffs' expressive activity <u>cannot</u> be punished as disorderly conduct <u>as a matter of law</u>.  In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), for example, the Supreme Court did not allow convictions to stand because the trial judge

---

[10] Issuing *one* citation, giving *three verbal warnings*, and temporarily detaining *two* individuals, as set forth in Defendants' "Post-Operation Report," hardly constitute a reasonable response in defense of the important First Amendment interests at stake.  (Defs.' Br., Ex. I [Doc. No. 13-9]).  Indeed, there is no justification for threatening to arrest Plaintiffs (and their entire group of Christian protestors) for disorderly conduct if *they* did not leave the Arab Festival.  As the evidence shows, when Defendants did make their presence known to the crowd, the violence stopped and the speech continued.  (Israel Decl. at ¶ 21, Ex. B [Chapter 2], at Ex. 1; Compl. at ¶ 49).

charged that the defendants' speech could be punished as a breach of the peace "if it stirs the public

to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests

the inhabitants in the enjoyment of peace and quiet by arousing alarm." *Id.* at 3.  In finding such a

position unconstitutional, the Supreme Court famously stated,

> [A] function of free speech under our system of government is to invite dispute.  It
> may indeed best serve its high purpose when it induces a condition of unrest, creates
> dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is
> often provocative and challenging.  It may strike at prejudices and preconceptions
> and have profound unsettling effects as it presses for acceptance of an idea.  That is
> why freedom of speech . . . is . . . protected against censorship or punishment. . . .
> *There is no room under our Constitution for a more restrictive view*.

*Id*. at 4 (emphasis added); *see also NAACP v. Claiborne Hardware, Co*., 458 U.S. 886, 928 (1982)

("The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of

protected speech. . . ."); *Sandul v. Larion*, 119 F.3d 1250 (6th Cir. 1997) (holding that the plaintiff's

conduct, which included shouting "f--k you" and extending his middle finger to a group of abortion

protestors, was constitutionally protected speech and could not serve as a basis for a violation of the

city's disorderly conduct ordinance); *Edwards,* 372 U.S. at 237 (reversing breach of the peace

convictions and observing that the petitioners "were convicted upon evidence which showed no

more than that the opinions which they were peaceably expressing were sufficiently opposed to the

views of the majority of the community to attract a crowd and necessitate police protection").

In the final analysis, there can be no reasonable dispute that by threatening to arrest Plaintiffs

for disorderly conduct for engaging in constitutionally protected speech based on the adverse and

criminal response of counter-protestors who objected to Plaintiffs' message, Defendants violated

Plaintiffs' clearly established constitutional rights.

### C.    Defendants' Speech Restriction Violated the Equal Protection Clause.

In *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92 (1972), the Court struck down

a city ordinance that prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute.  In doing so, the Court stated the relevant principle of law that is applicable here: "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  *Id*. at 96; *see also Carey v. Brown*, 447 U.S. 455, 461-62 (1980) (discriminating among speech-related activities in a public forum violates the Equal Protection Clause).

As the facts and allegations demonstrate, Defendants' order to Plaintiffs that they cease their free speech activity under threat of arrest for disorderly conduct based on the adverse reaction of Muslim counter-protestors violated the Equal Protection Clause (as well as the First Amendment) by denying Plaintiffs access to a public forum to engage in their religious speech activities, which Defendants disfavored by their words and actions, while permitting the Muslims to use this forum to engage in a counter-protest that included committing acts of violence, shouting profanities, and mocking the Christians—a counter-protest that had the purpose and, as a result of Defendants' actions, effect of silencing Plaintiffs' message in violation of the equal protection guarantee of the Fourteenth Amendment.

## II.     The County Is Liable for Violating Plaintiffs' Constitutional Rights.

In *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978), the Supreme Court affirmed that municipalities are liable under 42 U.S.C. § 1983 if municipal policy or custom was the "moving force" behind the alleged unconstitutional action.  And "when *execution* of a government's policy or custom, *whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy*, inflicts the injury . . . the government as an entity is responsible under § 1983."  *Id*. at 694 (emphasis added).

"*Monell* is a case about responsibility." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). "The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id*. at 479. Thus, acts "of the municipality" are "*acts which the municipality has officially sanctioned or ordered*." *Id*. at 480 (emphasis added). Consequently, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id*. at 480. Indeed, "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made *by the government's authorized decisionmakers*, it surely represents an act of official government 'policy' as that term is commonly understood."[11] *Id*. at 481 (emphasis added).

Thus, for example, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the municipality was held liable for a decision made by the county prosecutor that resulted in the violation of the petitioner's Fourth Amendment rights. Based on his understanding of the law, the prosecutor made a considered decision and authorized deputy sheriffs to forcibly enter the petitioner's medical clinic to serve capiases on two of the petitioner's employees who were subpoenaed as witnesses, but had failed to appear before a grand jury. *Id*. at 484.

---

[11] Municipal liability may also be based on injuries caused by a failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused. *City of Canton v. Harris*, 489 U.S. 378, 388-91(1989). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). A "policy of inaction" after having received notice creates the constitutional violation. *Id*. As alleged in the Complaint and as evidenced by the County's pattern of conduct in 2011 and again in 2012, the County has failed to adequately train or supervise its employees with regard to the First Amendment rights of speakers who express disfavored messages to a hostile crowd. (*See* Compl. at ¶¶ 67-69).

Here, there is little doubt that the County is ultimately responsible for the order _to arrest Plaintiffs for disorderly conduct_ if they did not halt their free speech activity based on the hostile crowd's reaction to their speech—an order that violated Plaintiffs' constitutional rights. This order was issued pursuant to County "policy" as evidenced by the County's agreement to provide law enforcement for the Arab Festival; its stated mission to "keep the peace" at the festival "in the event there is a disturbance," _see Saieg_, 641 F.3d at 742 (holding the City liable for enforcing the Arab Festival rule prohibiting literature distribution); its labeling of Plaintiff Bible Believers as a "radical group" that intends to engage in provocative conduct at the Arab Festival; and its Corporation Counsel's[12] warning to Plaintiffs that if their conduct has "the tendency to incite riotous behavior or otherwise disturb the peace" then Plaintiffs will be held "criminally accountable," and further warning Plaintiffs that the County "cannot protect everyone from the foreseeable consequences that come from speech that is designed and perhaps intended to elicit a potentially negative reaction."

Indeed, the County's Corporation Counsel also set forth the "policy" of the County with regard to its response to a situation in which a crowd reacts negatively toward a speaker, and this "policy" was plainly the moving force behind the arrest order from Defendant Richardson—who, along with Defendant Jaafar, was a member of the "Executive Command Unit" (_see_ Defs.' Br. at 3) and thus plainly in charge of the law enforcement actions at the Arab Festival on behalf of the County. In short, it is the County and its policies that were the moving force behind Defendant Richardson's unlawful order to Plaintiffs (_i.e._, that Plaintiffs would be _arrested for disorderly conduct_ if they did not halt their free speech activity and leave the Arab Festival). And this conclusion is further reinforced by the fact that Defendant Richardson was seen on video consulting

---

[12] "The mission of the Department of Corporation Counsel is to provide legal representation, litigation, legal advice and counsel, and Human Relations business certification services to benefit Wayne County departments and elected officials, so they can legally fulfill their official duties." (available at http://www.co.wayne.mi.us/cc.htm [last visited on Feb. 6, 2013]).

with Ms. Ursula Henry, Director of Legal Affairs for the Wayne County Sheriff's Office, prior to issuing his unlawful order.

### III.     Defendants Richardson and Jaafar Are Not Entitled to Qualified Immunity.

As an initial matter, qualified immunity does not protect a defendant against claims for declaratory and injunctive relief, nor does it apply to claims against a municipality, such as the claims advanced against the County.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841, n.5 (1998) (noting that qualified immunity is unavailable "in a suit to enjoin future conduct [or] in an action against a municipality"); *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 876 (10th Cir. 1993) (stating that "there is no qualified immunity to shield the defendants from claims" for "declaratory and injunctive relief"); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified immunity . . . does not bar actions for declaratory or injunctive relief."); *see also Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997) ("Qualified immunity shields defendant from personal liability, but it does not shield him from the claims brought against him in his official capacity.").

Moreover, government officials are protected from personal liability and thus enjoy qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted).

Defendants' reliance on *Glasson* to support their qualified immunity claim (Defs.' Br. at 13)

is misplaced in that *Glasson* does not state the current and applicable standard for this defense.[13] *Compare Glasson*, 518 F.2d at 910 (incorrectly concluding that an officer "will not be civilly liable if his conduct is based on a reasonable and good faith belief that it was necessary under the circumstances"), *with Harlow*, 457 U.S. at 819 (stating that the qualified immunity test "focuses on the *objective legal* reasonableness of an official's acts") (emphasis added).  Moreover, neither the *Glasson* reasoning nor, as noted, qualified immunity in general applies to Plaintiffs' claims for declaratory and injunctive relief regarding Defendants' threat to arrest and cite Plaintiffs for disorderly conduct based on the hostile crowd's reaction to their speech activity.  *See Glasson*, 518 F.2d at 907 (stating that its analysis did not apply to injunctive relief, only civil damages).

 *Glasson* is relevant, however, in this respect: it reinforces the clearly established principle of constitutional law that "[t]he state may not rely on community hostility and threats of violence to justify censorship."  *Id*. at 906.  As stated in *Glasson*, "To permit police officers . . . *to punish for incitement or breach of the peace* the peaceful communication of . . . messages because other persons are provoked and seek to take violent action against the speaker *would subvert the First Amendment*, and would incorporate into that constitutional guarantee a 'heckler's veto' which would empower an audience to cut off expression of a speaker with whom it disagreed."  *Id*. at 905-06 (emphasis added).  Defendants Richardson and Jaafar violated this clearly established principle of law.

 Additionally, even under *Glasson*'s reasoning, Defendants' actions were entirely unreasonable.  *See, e.g., Glasson*, 518 F.2d at 910-11 (holding that the police officers were required

---

[13] Moreover, *Glasson* makes clear that an officer need not "respond in damages" for intercepting a speaker's message or removing the speaker when failing to do so *would subject the officers* "to violent retaliation or physical injury," *Glasson*, 518 F.2d at 909—a fact that is non-existent here. Moreover, *Glasson* does not countenance the police officer to arrest (or threaten to arrest) the speaker for disorderly conduct because a crowd is reacting negatively toward his or her speech.

to respond in damages under § 1983 for failing to protect the speaker under the circumstances).  As the undisputed evidence shows, Defendants did virtually nothing to protect Plaintiffs' right to freedom of speech at the Arab Festival.  Had Defendants demonstrated to the public and the Muslim attackers even a modicum of willingness to truly halt or arrest members of the hostile crowd for interfering with Plaintiffs' speech activity, Plaintiffs would have been able to continue their constitutionally protected activity free from interference.  As Defendants admit, they had a significant law enforcement presence at the Arab Festival—"larger than the Sheriff's Department contribution to the Word Series or the President of the United States when he visits Michigan." (Defs.' Br. at 3).  As noted, this force consisted of thirty-four (34) deputy sheriffs and nineteen (19) reserve officers, and it included a mounted unit with six (6) horses.  (Defs.' Br. at 3).

Yet, Defendants ask this court to accept their claim that this robust security force could do nothing to quiet a small crowd of violent teenagers intent on throwing bottles and other debris at Plaintiffs.  And worse yet, Defendants ask this court to ratify their patently unlawful order to Plaintiffs that if *they* didn't halt their peaceful, free speech activity, then Defendants would arrest them.  Defendants' position is objectively unreasonable, if not entirely absurd.  Indeed, Defendants' actions (or, more accurately, inaction) rewarded and, in effect, condoned the criminal behavior of the Muslim protestors, in violation of Plaintiffs' constitutional rights.  Moreover, Defendants' credibility must be weighed in light of Defendants' submission of Defendant Richardson's affidavit in which he states that he "*asked* Plaintiffs that they leave the immediate area *for their own safety*." (*See* Defs.' Br., Ex. F [Doc. No. 13-6]) (emphasis added).  The video evidence demonstrates this sworn testimony to be materially false and misleading.

Moreover, the evidence plainly allows a reasonable trier-of-fact to reject Defendants' transparently self-serving rationalization of their unconstitutional conduct and to infer that

Defendants sided with the Muslim attackers.  Indeed, given the evidence, including the video record, the trier-of-fact could reasonable and easily conclude that Defendants chose to threaten Plaintiffs with an unconstitutional arrest because Defendants too found Plaintiffs to be a "radical group" with an "offensive" message.  As noted further below, this alone is sufficient to defeat Defendants' claim of qualified immunity.

In the final analysis, to determine whether Defendants Richardson and Jaafar are entitled to qualified immunity from damages in this action in their individual capacities,[14] the test is "(1) whether, _considering the allegations in a light most favorable to_ [_Plaintiffs_], a constitutional right has been violated, and (2) whether that right was clearly established."  *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (emphasis added).  The court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances" of the particular case.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, it was clearly established on June 15, 2012, that Plaintiffs had a constitutional right to peacefully carry signs and wear t-shirts that expressed a Christian (or even anti-Islam) message on the public streets of Dearborn, (*see. e.g.,* Defs.' Br. 22 [conceding that "Plaintiffs cannot be excluded from the streets and sidewalks of Dearborn where the Festival took place"]), and that their free speech activity could _not_ be punished by government officials based on "community hostility and threats of violence."  It was, and it remains today, clearly established that the First Amendment knows no heckler's veto.  *Forsyth Cnty.,* 505 U.S. at 134; *see also Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d at 790; *Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973) ("[A]s the Supreme Court has often emphasized in related contexts, state officials are not entitled to rely on

---

[14] Upon finding a constitutional violation, Plaintiffs are entitled to nominal damages for the past loss of their constitutional rights as a matter of law.  *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1991) (holding that nominal damages must be awarded as a matter of law upon finding a constitutional violation).

community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights.") (citing cases); *see also Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 824 (6th Cir. 2007) (denying qualified immunity because "Supreme Court decisions . . . recognize that government actions may not retaliate against an individual for the exercise of protected First Amendment freedoms" and thus concluding that "the 'contours of the right' to be free from retaliation were thus abundantly clear") (internal quotations and citation omitted).

As noted above, the facts and allegations (and the inferences drawn from them) establish that Defendants Richardson and Jaafar acted with a retaliatory motive, believing that Plaintiffs were part of a "radical group" that expressed an "offensive" message.  (Defs.' Br., Ex. E [Doc. No. 13-5] [describing "The Bible Believers" as a "radical group"]; Compl. at ¶¶ 53-55, 58).  Defendant Jaafar, a local celebrity of TLC's now defunct "All American Muslim" television program, plainly sided with the Muslim lawbreakers to avoid condemnation from his community.  *See, e.g., Smith*, 482 F.2d at 37 ("We do not condone the actions of the deputy, who would have served his office more honorably by unequivocally protecting appellant regardless of the local unpopularity his actions might have evoked").  Consequently, *these facts and allegations alone prove dispositive of the qualified immunity inquiry.  Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d at 825 ("Because retaliatory intent proves dispositive of Defendants' claim to qualified immunity, summary judgment was inappropriate.").

In sum, Defendants' claim of qualified immunity must be rejected.

## CONCLUSION

Plaintiffs respectfully request that this court deny Defendants' motion and grant judgment in their favor on their constitutional claims as a matter of law.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

/s/ David Yerushalmi
David Yerushalmi, Esq.
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the exhibit that was filed in the traditional manner has been served by ordinary U.S. mail upon the following:

ABIH H. AYAD & ASSOCIATES, P.C.
Abih H. Ayad (P59518)
2200 Canton Center Rd., Ste. 220
Canton, Michigan 48187

*Counsel for Defendants*

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

28