## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BIBLE BELIEVERS; RUBEN CHAVEZ (a.k.a. RUBEN ISRAEL); ARTHUR FISHER; and JOSHUA DELOSSANTOS,<br><br>                Plaintiffs,<br><br>        v.<br><br>WAYNE COUNTY; BENNY N. NAPOLEON, in his official capacity as Sheriff, Wayne County Sheriff's Office; DENNIS RICHARDSON, individually and in his official capacity as Deputy Chief, Wayne County Sheriff's Office; and MIKE JAAFAR, individually and in his official capacity as Deputy Chief, Wayne County Sheriff's Office,<br><br>                Defendants. | No. 2:12-cv-14236-PJD-DRG<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**<br><br>Hon. Patrick J. Duggan |

AMERICAN FREEDOM LAW CENTER
Robert J. Muise, Esq. (P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756

David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
david.yerushalmi@verizon.net
(646) 262-0500
*Counsel for Plaintiffs*

ABIH H. AYAD & ASSOCIATES, P.C.
Abih H. Ayad (P59518)
2200 Canton Center Rd., Ste. 220
Canton, Michigan 48187
ayadlaw@hotmail.com
(734) 983-0500
*Counsel for Defendants*

---

Plaintiffs Bible Believers, Ruben Chavez (a.k.a. Ruben Israel), Arthur Fisher, and Joshua DeLosSantos ("Plaintiffs"), by and through their undersigned counsel, hereby move this court for a preliminary injunction pursuant to Fed. R. Civ. P. 65 and E.D. Mich. LR 65.1 in order to prevent irreparable injury to Plaintiffs' fundamental rights and interests.

In support of this motion, Plaintiffs rely upon the pleadings and papers of record, as well as their brief filed with this motion.

For the reasons set forth more fully in their brief, Plaintiffs hereby request that this court preliminarily enjoin Defendants from restricting Plaintiffs' right to engage in religious speech on the public sidewalks and other public areas during the 2013 Arab Festival based on the content of Plaintiffs' message.  In 2012, Defendants ordered Plaintiffs to halt their free speech activity and depart the Arab Festival area under threat of arrest for disorderly conduct.  However, Plaintiffs' speech activity cannot be criminally punished as a matter of law.  Moreover, Defendants have a duty *not* to effectuate a heckler's veto by censoring Plaintiffs' speech based on the adverse reaction of listeners or viewers to the content of Plaintiffs' message *and* the concomitant duty to insure Plaintiffs' safety and security in the free exercise of their constitutional rights.

Pursuant to E.D. Mich. LR 7.1, on February 18, 2013, a meet-and-confer was held in which Plaintiffs' counsel sought but did not receive concurrence from Defendants' counsel in the relief sought by this motion.

WHEREFORE, Plaintiffs hereby request that this court grant this motion for a preliminary injunction.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

BIBLE BELIEVERS; RUBEN CHAVEZ (a.k.a.
RUBEN ISRAEL); ARTHUR FISHER; and
JOSHUA DELOSSANTOS,

        Plaintiffs,

    v.

WAYNE COUNTY; BENNY N. NAPOLEON, in
his official capacity as Sheriff, Wayne County
Sheriff's Office; DENNIS RICHARDSON,
individually and in his official capacity as Deputy
Chief, Wayne County Sheriff's Office; and MIKE
JAAFAR, individually and in his official capacity as
Deputy Chief, Wayne County Sheriff's Office,

        Defendants.

No. 2:12-cv-14236-PJD-DRG

**PLAINTIFFS' BRIEF IN**
**SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION**

Hon. Patrick J. Duggan

AMERICAN FREEDOM LAW CENTER
Robert J. Muise, Esq. (P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756

David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
david.yerushalmi@verizon.net
(646) 262-0500
*Counsel for Plaintiffs*

ABIH H. AYAD & ASSOCIATES, P.C.
Abih H. Ayad (P59518)
2200 Canton Center Rd., Ste. 220
Canton, Michigan 48187
ayadlaw@hotmail.com
(734) 983-0500
*Counsel for Defendants*

**ISSUE PRESENTED**

Whether Defendants' restriction on Plaintiffs' private religious speech on the public sidewalks and other public areas during the Arab Festival held in Dearborn, Michigan based on the adverse reaction of listeners or viewers to the content of Plaintiffs' message causes irreparable harm to Plaintiffs sufficient to warrant preliminary injunctive relief.

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)

*Cottonreader v. Johnson*, 252 F. Supp. 492 (M.D. Ala. 1966)

*Elrod v. Burns*, 427 U.S. 347 (1976)

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992)

*Glasson v. Louisville*, 518 F.2d 899 (6th Cir. 1975)

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011)

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)

**BRIEF IN SUPPORT OF MOTION**

This case challenges Defendants' restriction on Plaintiffs' right to engage in religious speech on the public sidewalks and other public areas during the Arab Festival, which is held each June in the City of Dearborn, Michigan.  In 2012, Defendants threatened to arrest Plaintiffs for disorderly conduct based on the adverse and criminal response of hecklers' who disagreed with the content of Plaintiffs' message.

The basis for the requested injunctive relief in this case is illustrated by the case of *Cottonreader v. Johnson*, 252 F. Supp. 492 (M.D. Ala. 1966), which was cited with approval by the Sixth Circuit in *Glasson v. Louisville*, 518 F.2d 899, 907 (6th Cir. 1975).  In *Cottonreader*, the federal court "issued an injunction that ordered police officers to protect [the demonstrators for racial equality] from violent actions threatened by persons opposed to their cause." *Glasson*, 518 F.2d at 907.  In granting the requested injunctive relief, the Alabama federal court stated, "Thus, the threat of violence or public hostility to the views of those exercising First Amendment liberties does not of itself justify denial of the right, but rather is grounds for injunctive relief." *Cottonreader*, 252 F. Supp. at 497; *see also Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973) ("[A]s the Supreme Court has often emphasized in related contexts, state officials are not entitled to rely on community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights.").

Moreover, in the present case, Defendants sought to *criminalize* Plaintiffs' speech by threatening to arrest them for disorderly conduct if they did not halt their constitutionally protected activity.  Consequently, an order enjoining Defendants from criminally punishing and thereby prohibiting Plaintiffs' constitutionally protected speech activity is also warranted.  *See Terminiello v. City of Chicago*, 337 U.S. 1 (1949) (holding that speech which "stirs the public to

anger, invites dispute, brings about a condition of unrest, or creates a disturbance" cannot be criminally punished).

## STATEMENT OF FACTS[1]

### I.      Plaintiffs' Free Speech Activity.

Plaintiff Bible Believers is an unincorporated association of individuals who share and express their Christian faith with others, including Muslims, through free speech activities, including street preaching and displaying signs, banners, and t-shirts with various messages. Bible Believers has over 60 chapters nationwide, and Plaintiffs Israel,[2] Fisher, and DeLosSantos are members of the organization.  (Israel Decl. at ¶ 3 at Ex. 1 [Doc. No. 20-2]).

Plaintiff Israel is a travelling Christian evangelist who, based upon his sincerely held religious beliefs, shares and expresses his Christian faith with others, including Muslims, through free speech activities, which include street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes.  Plaintiff Israel was the leader and spokesperson for a group of Christian evangelists that attended the Arab Festival held in Dearborn, Michigan in June 2011 and again in June 2012.  Plaintiff Israel engaged in his speech activity at each Arab Festival as a member of Bible Believers.  (Israel Decl. at ¶¶ 1-4 at Ex. 1 [Doc. No. 20-2]).

### II.     Defendants Are the "Lead Law Enforcement Agency" at the Arab Festival.

Defendant Wayne County is a charter county existing under the laws of the State of Michigan, Defendant Benny N. Napoleon is the Wayne County Sheriff, and Defendants Dennis

---

[1] The relevant facts set forth in this brief are supported by the declarations and exhibits filed by Plaintiffs in their opposition (Doc. No. 20) to Defendants' motion to dismiss or in the alternative motion for summary judgment (Doc. No. 13).

[2] Plaintiff Israel's legal name is Ruben Chavez.  However, he is known to the public as Ruben Israel and will be referred to in this brief and throughout this litigation as Plaintiff Israel.

Richardson and Mike Jaafar are Deputy Chiefs with the Wayne County Sheriff's Office. (Answer at ¶¶ 10-13 [admitting facts]).

On or about June 2, 2011, the City of Dearborn entered into an agreement with the Wayne County Sheriff's Office, which was acting on behalf of Defendant Wayne County, in which "[t]he Wayne County Sheriff's Department [agreed to] be the lead law enforcement agency within the perimeter of the [Arab] Festival" (hereinafter "Agreement"). The Agreement was signed on behalf of Defendant Napoleon. (Answer at ¶ 28 [admitting facts]). The American Arab Chamber of Commerce, which is responsible for organizing the Arab Festival, was also a party to the Agreement. (Muise Decl. at ¶ 3, Ex. A, at Ex. 2 [Doc. No. 20-3]). Per the Agreement, the Arab Festival was conducted pursuant to, *inter alia*, the "rules and regulations" of the [American Arab Chamber of Commerce] and the Wayne County Sheriff's Department." (Muise Decl. at ¶ 3, Ex. A, at Ex. 2 [Doc. No. 20-3]). As the lead law enforcement agency for the Arab Festival, the stated mission of the Wayne County Sheriff's Office is "to provide Wayne County citizens, festival patrons, organizers, [and] merchants with law enforcement presence and to ensure the safety of the public, and keep the peace in the event there is a disturbance." (Defs.' Br., Ex. E [Doc. No. 13-5]).

## III.  Dearborn Arab Festival: A Public Forum for Speech.

For the past seventeen years, the Arab Festival was held in Dearborn, Michigan. The 17th Annual Arab Festival was held from Friday, June 15, 2012 to Sunday, June 17, 2012. (Answer at ¶ 17 [admitting facts]). The Arab Festival takes place on the city streets in Dearborn. At various points, barriers are erected to separate the sidewalks from the festival, which is a street festival held mostly on Warren Avenue. (Israel Decl. at ¶¶ 6-7 at Ex. 1 [Doc. No. 20-2]).

The public sidewalks along Warren Avenue retain their character as a public forum during the Arab Festival.  *See Saieg v. City of Dearborn*, 641 F.3d 727, 737-41 (6th Cir. 2011) (striking down speech restriction at Arab Festival on First Amendment grounds).   The Agreement, to which Defendant Wayne County is a party, acknowledged this fact, observing that the Sixth Circuit "held that because the Festival is not cordoned off, nor is a fee charged for entry, and because people may use the public sidewalks to access the businesses that remain open during the Festival, that free speech in the form of leafleting on the public sidewalks within the Festival is permitted."  (Muise Decl. at ¶ 3, Ex. A at Ex. 2 [Doc. No. 20-3]; *see also* Israel Decl. at ¶¶ 6-7 at Ex. 1 [Doc. No. 20-2]).

**IV.     Plaintiffs' Free Speech Activity at the 2012 Arab Festival.**

On or about June 15, 2012, Plaintiffs and their Christian companions went to the Warren Avenue area where the Arab Festival was taking place and wore t-shirts and carried signs and banners expressing their Christian message.  Plaintiffs peacefully engaged in their expressive activity along the public sidewalks and other public areas where pedestrian traffic was permitted.  (Israel Decl. at ¶¶ 14-17 at Ex. 1 [Doc. No. 20-2]).

During Plaintiffs' expressive activity, Plaintiff Israel wore a t-shirt with the message, "Fear God" on the front and "Trust Jesus, Repent and Believe in Jesus" on the back.  Plaintiff Fisher wore a t-shirt with the message, "Trust Jesus" on the front and "Fear God and Give Him Glory" on the back, and he carried a banner that said on one side, "Only Jesus Christ Can Save You From Sin and Hell," and on the other side it said, "Jesus Is the Judge, Therefore, Repent, Be Converted That Your Sins May Be Blotted Out."  Plaintiff Fisher also carried a small, hand-held camera to record the event.  Plaintiff DeLosSantos accompanied Plaintiffs and joined in their free speech activity.  (Israel Decl. at ¶ 16 at Ex. 1 [Doc. No. 20-2]).

4

Other messages conveyed on t-shirts, signs, or banners that accompanied Plaintiffs included, among others, "Prepare to Meet Thy God – Amos 4:12," "Obey God, Repent," "Turn or Burn," "Jesus Is the Way, the Truth and the Life.  All Others Are Thieves and Robbers," and "Islam Is A Religion of Blood and Murder."  (Israel Decl. at ¶ 17 at Ex. 1 [Doc. No. 20-2]).

While Plaintiffs and their companions were walking along the public sidewalks and expressing their message, they were assaulted by a group of Muslims, which consisted mostly of teenagers.[3]  Adult bystanders were encouraging the Muslim youths, who were throwing bottles, rocks, and other debris at the Christians.  The Muslims were also shouting and blowing horns to harass the Christians.  Some of the Muslims spat at the Christians.  Several Christians, including Plaintiff Israel, were bruised and bloodied by the assault.  The Muslims also shouted profanities at the Christians and mocked the Christians' faith.  The Christians responded by simply holding up their hands to avoid being falsely accused of acting aggressively toward their Muslim attackers.  (Israel Decl. at ¶¶ 18-20, Ex. B [Chapter 1], at Ex. 1 [Doc. No. 20-2]).

When Wayne County deputies appeared at the scene of the Muslim violence, the Muslims would momentarily halt their attack, only to resume it once the deputies departed. (Israel Decl. at ¶ 21, Ex. B [Chapter 2], at Ex. 1 [Doc. No. 20-2]).  The Muslims did not attack the Wayne County deputies; they only attacked the Christians.  (Israel Decl., Ex. B [Chapters 1 & 2] at Ex. 1 [Doc. No. 20-2]).

**V.      Defendants' Unconstitutional Restriction on Plaintiffs' Speech.**

Shortly upon Plaintiffs' arrival at the Arab Festival and continuing for approximately the first hour while they were expressing their message, Defendant Jaafar was repeatedly telling

---

[3] It was evident to Plaintiffs that the violent counter-protestors were Muslim by what they were saying and how they were reacting to Plaintiffs' messages.  (Israel Decl. at ¶ 19, Ex. B [Chapter 1 & 3], at Ex. 1 [Doc. No. 20-2]).

Defendant Richardson that Plaintiffs need to be removed and that he (Defendant Richardson) needs to do something about it.  (Israel Decl. at ¶ 22 at Ex. 1 [Doc. No. 20-2]).

Approximately 30 minutes later, Defendant Jaafar confronted Plaintiff Israel, and in an angry manner told him that the deputies were not going to protect him or his fellow Christians. Defendant Jaafar told Plaintiff Israel that he and his fellow Christians had "the option to leave." Plaintiff Israel responded to Defendant Jaafar, telling him that Defendants had the option "to stand with us."  Defendant Jaafar did not respond.  Instead, he abruptly departed.[4]  (Israel Decl. at ¶¶ 23-24, Ex. B [Chapter 3] at Ex. 1 [Doc. No. 20-2]).

Moments after Defendant Jaafar departed, Defendant Richardson took over and escorted Plaintiff Israel to the side to discuss the matter.  With blood dripping from his forehead as a result of the Muslim attacks, Plaintiff Israel pleaded with Defendant Richardson to assign just two Wayne County deputies to stand with the Christians during their speech activity, noting that when uniform officers are present, the Muslims stop their criminal assault.  Defendant Richardson refused.  (Israel Decl. at ¶¶ 25-26, Ex. B [Chapter 4], at Ex. 1 [Doc. No. 20-2]).

While speaking with Plaintiff Israel, Defendant Richardson criticized Plaintiffs for their speech, motioning toward the Christians and stating, "Look at your people here.  Look it, look it. This is crazy."  (Israel Decl. at ¶ 27, Ex. B [Chapter 4], at Ex. 1 [Doc. No. 20-2]).

At one point, Deputy Chief Richardson stepped away from the conversation and was seen consulting with Ursula Henry, Director of Legal Affairs for the Wayne County Sheriff's Office. (Israel Decl. at ¶ 28, Ex. B [Chapter 4], at Ex. 1 [Doc. No. 20-2]).  After consulting with Ms.

---

[4] Defendant Jaafar, a Muslim, was featured in the now-cancelled show, "All American Muslim," which appeared on The Learning Channel (TLC).  (Answer at ¶ 53 [admitting facts]).  In a 2012 televised segment of "All American Muslim," Defendants Jaafar and Richardson were on camera discussing the 2011 Arab Festival.  During this conversation, Defendants Jaafar and Richardson discussed Plaintiffs' signs and banners, describing Plaintiffs' message as "offensive."  (Israel Decl. at ¶ 35 at Ex. 1 [Doc. No. 20-2]).

Henry, Defendant Richardson returned and gave Plaintiffs an ultimatum: _Plaintiffs could either leave the Arab Festival or they would be criminally cited and arrested for disorderly conduct_. Defendant Richardson stated, "If you don't leave we are going to cite you for disorderly."  This conversation was captured on video.  (Israel Decl. at ¶¶ 27-29, Ex. B [Chapter 4], at Ex. 1 [Doc. No. 20-2]).

To avoid being cited and arrested by Defendants, Plaintiffs ceased their free speech activity and departed the area.  (Israel Decl. at ¶ 30, Ex. B [Chapter 4], at Ex. 1 [Doc. No. 20-2]).

While Defendants claim that they could not spare just two deputies to allow Plaintiffs to engage in their peaceful speech activity, more than a dozen deputies arrived at the scene to ensure that Plaintiffs ceased their activity and departed the area under threat of arrest.  (Israel Decl. at ¶ 31, Ex. B [Chapter 5], at Ex. 1 [Doc. No. 20-2]).

Defendants' actions drew cheers from Muslim onlookers who were involved in the violent attacks.  However, at no time did Wayne County deputies publicly arrest the Muslim attackers and take them away in handcuffs[5]—an action that would have quieted the crowd and permitted Plaintiffs to continue their free speech activity without interference.  (Israel Decl. at ¶ 32 at Ex. 1 [Doc. No. 20-2]).

Shortly after departing the Arab Festival in their van, more than a dozen law enforcement officers were available to pull over Plaintiffs, conduct a traffic stop, and issue the driver a traffic citation—the citation was issued by a Wayne County deputy.  The citation was issued because

---

[5] According to Defendants' "Post-Operation Report," Defendants issued only _one_ citation for disturbing the peace, gave only _three verbal_ warnings, and briefly detained _two_ other individuals. (Defs.' Br., Ex. I [Doc. No. 13-9]).  Yet, Defendants had thirty-four (34) deputies and nineteen (19) reserve officers on the scene, and this force included a mounted unit with six (6) horses. (Defs.' Br. at 3 [Doc. No. 13]).  Moreover, according to Defendants' report, only two of these individuals—the one who received the citation and one who was temporarily detained—were associated with Plaintiffs (_i.e._, the report identifies them as related to "(Bible Believers)"). (Defs.' Br., Ex. I [Doc. No. 13-9]).

7

Plaintiffs had removed the license plate from their van for security reasons—they did not want their vehicle to be identified by any of the hostile counter-protestors as they were leaving the Arab Festival area. (Israel Decl. at ¶ 34, Ex. B [Chapter 6] at Ex. 1 [Doc. No. 20-2]).

Plaintiffs want to return to Dearborn during the Annual Arab Festival in June 2013 to engage in their free speech activity. However, they fear that if they do return, they will again be attacked by Muslims and forced to halt their speech activity under the threat of arrest for disorderly conduct. (Israel Decl. at ¶ 36 at Ex. 1 [Doc. No. 20-2]).

## ARGUMENT

The standard for issuing a preliminary injunction in this Circuit is well established. In *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), the court stated:

> In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Id.; see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Typically, the reviewing court will balance these factors, and no single factor will necessarily be determinative of whether or not to grant the injunction. *Connection Distributing Co.*, 154 F.3d at 288. However, because this case deals with a violation of Plaintiffs' First Amendment right to freedom of speech, the crucial and often dispositive factor is whether Plaintiffs are likely to prevail on the merits. *Id.*

8

**A.       Plaintiffs' Likelihood of Success on the Merits.**

The First Amendment provides in pertinent part that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Plaintiffs' First Amendment right to freedom of speech is protected from infringement by States and their political subdivisions, such as Defendants, by operation of the Fourteenth Amendment.  *See Cantwell v. Conn.*, 310 U.S. 296, 303 (1940).  Indeed, the freedom of speech is a fundamental right that is essential for the preservation of our republican form of government.  As the Supreme Court has long recognized, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citations omitted).  Moreover, Supreme Court precedent "establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."  *Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

The likelihood of success of Plaintiffs' free speech claim is examined in essentially three steps.  *See Saieg v. City of Dearborn*, 641 F.3d 727, 734 (6th Cir. 2011).  First, the court must determine whether the speech in question—Plaintiffs' religious signs and banners—is protected speech.  Second, the court must conduct a forum analysis as to the forum in question to determine the proper constitutional standard to apply.  In this case, the forum is the public sidewalks and other public areas surrounding the Arab Festival held in Dearborn, Michigan.  And third, the court must then determine whether Defendants' restriction comports with the applicable standard.

As demonstrated below, Defendants' content-based restriction on Plaintiffs' speech in a public forum violates Plaintiffs' right to freedom of speech.

       1.      **Plaintiffs' Speech Activity Is Protected by the First Amendment.**

The first question is easily answered.  Conveying a religious message with signs, as Plaintiffs are doing here, is protected speech under the First Amendment.[6]  *See Hill v. Colo.*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."); *United States v. Grace*, 461 U.S. 171, 176-77 (1983) (demonstrating with signs constitutes protected speech under the First Amendment); *see also Capitol Square Rev.,* 515 U.S. at 760 ("[Religious expression] is as fully protected under the Free Speech Clause as secular private expression."). Indeed, "spreading one's religious beliefs" and "preaching the Gospel" are constitutionally protected activities.  *Murdock v. Pa.,* 319 U.S. 105, 110 (1943).

       2.      **Forum Analysis.**

To determine the extent of Plaintiffs' free speech rights in this matter, the court must next engage in a First Amendment forum analysis.  "The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums.  *Cornelius,* 473 U.S. at 800.  Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard.  *Id.*

On one end of the spectrum lies the traditional public forum.  Traditional public forums,

---

[6] Plaintiffs' right to videotape at the Arab Festival is also fully protected by the First Amendment and cannot be restricted by Defendants.  *See Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he videotaping of public officials is an exercise of First Amendment liberties.").  (*See* Defs.' Br., Ex. E [Doc. No. 13-5] [complaining that Plaintiff Bible Believers is one of the "groups" that will "show up at the festival trying to provoke [Wayne County Sheriff's Office] staff in a negative manner and attempt to capture the negativity on video camera"]).

such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939).

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity. *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983). As the Supreme Court stated, "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802.

In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny. *Id.* at 800 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . . Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest.").

At the opposite end of the spectrum is the nonpublic forum. The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n,* 460 U.S. at 46. In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id.*

Here, the public sidewalks and other public areas surrounding the Arab Festival retain their characteristic as a public forum.  *See Saieg*, 641 F.3d at 737-41 (striking down on First Amendment grounds the literature distribution policy enforced at the Arab Festival); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (holding that the city's "streets remained a traditional public forum" in a case striking down a restriction on the plaintiff's right to distribute religious literature on the city's streets, "notwithstanding the special permit that was issued to the Arts Council" to use the streets for the Columbus Arts Festival, which was open to the public); *see also Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988) ("[O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a 'cliché,' but recognition that wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public.  No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.") (internal quotations and citation omitted); *Schneider v. N.J.*, 308 U.S. 147, 163 (1939) ("[T]the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

And in a public forum, such as a city street or sidewalk, the government's ability to restrict speech is sharply limited.  *See Cornelius*, 473 U.S. at 802 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) (striking down city ordinance and stating, "Constitutional concerns are heightened further where, as here, the [challenged ordinance] restricts the public's use of streets and sidewalks for political speech"); *see also Perry Educ.*

*Ass'n v Perry Local Educators*, 460 U.S. 37, 55 (1983) ("[I]in a public forum . . . all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers. . . .").

### 3. Application of the Appropriate Standard.

In a public forum, the government may enforce reasonable, *content-neutral* time, place, and manner regulations of speech if the regulations are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Perry Educ. Ass'n,* 460 U.S. at 45; *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989); *Saieg*, 641 F.3d at 735. However, *content-based* restrictions on speech, such as the restriction at issue here, are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800. That is, "[s]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, content-based restrictions "are presumptively unconstitutional." *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998). The government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992); *see Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (holding that the government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express more controversial views).

Here, the evidence is undisputed that Defendants threatened to arrest Plaintiffs for disorderly conduct during the 2012 Arab Festival based on a hostile crowd's reaction to the

content of Plaintiffs' speech.  However, a listener's (or viewer's) reaction to speech is <u>not</u> a content-neutral basis for regulation.  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).  "The First Amendment knows no heckler's veto."  *See Lewis v. Wilson,* 253 F.3d 1077, 1082 (8th Cir. 2001).

While restrictions of speech because of the "secondary effects" that the speech creates are sometimes permissible, an effect from speech is not secondary if it arises from the content of the message.  "The emotive impact of speech on its audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780 789 (9th Cir. 2008) ("Nor is the reaction of listeners a secondary effect of speech that can be regulated. . . .").

Moreover, controlling precedent leaves no doubt that Plaintiffs' expressive activity *cannot* be punished as disorderly conduct as a matter of law.  In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), for example, the Supreme Court did not allow convictions to stand because the trial judge charged that the defendants' speech could be punished as a breach of the peace "if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm."  *Id.* at 3.  In finding such a position unconstitutional, the Supreme Court famously stated,

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech . . . is . . . protected against censorship or punishment. . . .  There is no room under our Constitution for a more restrictive view.

*Id*. at 4.

14

Therefore, the fact that Plaintiffs' speech may actually offend some persons does not lessen its constitutionally protected status; it enhances it.  "The fact that society may find speech offensive is not a sufficient reason for suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted); *Forsyth Cnty.,* 505 U.S. at 135 (noting that speech cannot be "punished or banned, simply because it might offend a hostile mob"); *Hill*, 530 U.S. at 715 & 710, n.7 ("The fact that the messages conveyed by [the signs] may be offensive to their recipients does not deprive them of constitutional protection."); *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. Indeed, the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.") (citations and quotations omitted).

"[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975).  Rather than censoring the speaker, the burden rests with the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes."  *Cohen v. Cal.*, 403 U.S. 15, 21 (1971).  As the *Cohen* Court noted, "[W]e cannot indulge the facile assumption that one can forbid particular words [or messages, as in this case] without also running a substantial risk of suppressing ideas in the process.  Indeed, governments might soon seize upon the censorship of particular words [or messages] as a convenient guise for banning the expression of unpopular views."  *Id.* at 26.

15

Thus, under the First Amendment, the government is not permitted to affirm the heckler; rather, it must protect the speaker and punish those who react lawlessly to a controversial message.  As the Sixth Circuit observed, "[The government] has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas.  Instead, he must take reasonable action to protect . . . persons exercising their constitutional rights." *Glasson v. Louisville*, 518 F.2d 899, 906 (6th Cir. 1975); *see also Cottonreader*, 252 F. Supp. at 497 (granting an injunction "to insure [plaintiffs'] safety and security in the free exercise of their constitutional rights").

In sum, Defendants cannot, consistent with the Constitution, criminalize and prohibit Plaintiffs' religious message because they or other listeners or viewers might find it offensive. Otherwise, the government "would effectively empower a majority to silence dissidents simply as a matter of personal predilections."  *Cohen*, 403 U.S. at 21.  Indeed, Defendants' actions demonstrate that they are intent on ratifying and effectuating a heckler's veto and joining the "moiling mob" that is intent on suppressing Plaintiffs' message rather than insuring Plaintiffs' safety and security in the free exercise of their constitutional rights—in direct violation of the First Amendment.

### B.      Irreparable Harm to Plaintiff without the Preliminary Injunction.

Plaintiffs will be irreparably harmed without the preliminary injunction.  Defendants' criminal prohibition on Plaintiffs' speech and their unwillingness to protect Plaintiffs from the Muslim mob intent on suppressing their message deprive Plaintiffs of their fundamental First Amendment right to freedom of speech—and this deprivation will continue absent injunctive relief because Plaintiffs fear returning to Dearborn during the 2013 Arab Festival without court protection.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Connection Distributing Co.*, 154 F.3d at 288. And this injury is sufficient to justify the requested injunction. *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." (citing *Elrod*)).

### C.     Whether Granting the Preliminary Injunction Will Cause Substantial Harm to Others.

In this case, the likelihood of harm to Plaintiffs is substantial because Plaintiffs intend only to peacefully exercise their First Amendment right to freedom of speech in a public forum, and the deprivation of this right, even for minimal periods, constitutes irreparable injury.

On the other hand, if Defendants are restrained from enforcing their criminal prohibition on Plaintiffs' speech and required "to insure [Plaintiffs'] safety and security in the free exercise of their constitutional rights," *Cottonreader*, 252 F. Supp. at 497, Defendants will suffer no harm because the exercise of constitutionally protected expression can never harm any of Defendants' or others' legitimate interests. *See Connection Distributing Co.*, 154 F. 3d at 288. Indeed, as noted above, Defendants have an affirmative duty to protect Plaintiffs' right to freedom of speech. *Glasson*, 518 F.2d at 906; *Cottonreader*, 252 F. Supp. at 497.

In the final analysis, the question of harm to others as well as the impact on the public interest "generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation. . . ." *Connection Distribution Co.*, 154 F.3d at 288. For if Plaintiffs show that their First Amendment right to freedom of speech has been violated, then the harm to others is inconsequential.

17

**D.      The Impact of the Preliminary Injunction on the Public Interest.**

The impact of the preliminary injunction on the public interest turns in large part on whether Defendants violated Plaintiffs' constitutional right to freedom of speech.  As the Sixth Circuit noted, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties").

As noted previously, Defendants' threat to criminalize Plaintiffs' speech based on the crowd's hostile reaction to Plaintiffs' message and Defendants' unwillingness to insure Plaintiffs' safety and security in the free exercise of their constitutional rights have— individually and collectively—deprived Plaintiffs of their fundamental right to freedom of speech protected by the First Amendment.  Therefore, it is in the public interest to issue the preliminary injunction.

**CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this court grant this motion.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)