UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIBLE BELIEVERS, RUBEN CHAVEZ,
ARTHUR FISHER, and JOSHUA
DELOSSANTOS,

               Plaintiffs,

     v.

WAYNE COUNTY, BENNY N. NAPOLEON,
in his official capacity as Sheriff, Wayne
County Sheriff's Office, DENNIS
RICHARDSON, individually and in his official
capacity as Deputy Chief, Wayne County
Sheriff's Office, and MIKE JAAFAR,
individually and in his official capacity as
Deputy Chief, Wayne County Sheriff's Office,

               Defendants.

Case No. 2:12-cv-14236

Hon. Patrick J. Duggan

## <u>OPINION AND ORDER</u>

      This case, like many cases with constitutional implications, grapples with the reconciliation of competing interests: "the right to disseminate ideas in public places as against claims of an effective power in government to keep the peace and to protect other interests of a civilized community."  *Niemotko v. Maryland*, 340 U.S. 268, 273-74, 71 S. Ct. 325, 328 (1951) (Frankfurter, J., concurring).  Plaintiffs, a group of traveling Christian evangelicals, attended the Arab International Festival in Dearborn, Michigan on June 15, 2012.  Due to concerns about public safety and public order, law enforcement officials employed by the Wayne County Sheriff's Office escorted Plaintiffs away from

the Festival, indicating that if Plaintiffs did not leave, they would be cited for disorderly conduct.  Plaintiffs brought suit under 42 U.S.C. § 1983, seeking to vindicate their First Amendment rights to free speech and free exercise of religion, as well as their equal protection rights secured by the Fourteenth Amendment.

Plaintiffs initiated this civil rights action against Defendant Wayne County as well as three named persons: (1) Wayne County Sheriff Benny Napoleon, who is sued in his official capacity; (2) Deputy Chief Dennis Richardson, who is sued in both his individual and official capacities; and (3) Deputy Chief Mike Jaafar, who is also sued in both his individual and official capacities.  Plaintiffs seek declaratory and injunctive relief, nominal damages, and costs and expenses.  Presently before the Court are (1) Plaintiffs' Motion for Preliminary Injunction, (ECF No. 22), (2) Defendants' Motion for Summary Judgment, or in the Alternative, Defendants' Motion to Dismiss, (ECF No. 13), and (3) Plaintiffs' Motion to Dismiss and Cross-Motion for Summary Judgment, (ECF No. 20).  The issues have been fully briefed and a motion hearing was held on May 7, 2013.  For the reasons stated herein, the Court grants summary judgment in favor of Defendants.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Arab International Festival Background**

Each summer, the City of Dearborn, located in southeastern Michigan, hosts a three-day Arab International Festival (the "Festival").  The Festival, which is free and open to the public, attracts approximately 250,000 people each year and features carnival attractions, a stage with live entertainment, international food, and merchandise sales. *Saieg v. City of Dearborn*, 641 F.3d 727, 730 (6th Cir. 2011).  The Festival grounds,

comprised of public streets and sidewalks, encompasses approximately fourteen city blocks.  (Defs.' Br. 1.)  In 2012, the Festival contained "twenty-six artisan vendors, thirty-seven information tables and/or food vendors, and twenty-two sponsor booths[.]" (*Id.* (citing Exs. B, C).)  Included among these booths were "a number of groups with a Christian or non-Muslim religious message including Christian Aid Ministries, Merriman Baptist Church, Josh McDowell Ministry, Rivers of Life, Light & Life Arabic Free Methodist Church, and Impact International Ministries."  (*Id.* at 2.)

**B.      The Parties**

Plaintiffs Ruben Chavez (also known as Ruben Israel and referred to herein as "Israel"), Arthur Fisher, and Joshua DeLosSantos – all traveling Christian evangelists – are members of Plaintiff Bible Believers.  The individual plaintiffs traveled with other members of Bible Believers to the Festival in 2012[1] in order to share and express their Christian faith with other Festival attendees.  Plaintiffs do this "through free speech activities, including street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes."  (Pls.' Resp. 4.)

The Wayne County Sheriff's Office was the exclusive law enforcement agency for the Festival.  (Defs.' Br. 4.)  Intelligence gathered prior to the 2012 Festival "revealed that a number of organizations, including Pastor Terry Jones and Plaintiff Bible Believers[,] intended to attend the Festival in order to provoke patrons of the crowd on video camera."  (*Id.* at 3 (citing Operations Plan, Defs.' Mot. Ex. E, at § 2.0).)  "Accordingly, the Sheriff's Department adopted a mission statement to 'provide Wayne

---

[1] Israel also attended the Festival in 2011.

County Citizens, festival patrons, organizers, [and] merchants with [a] law enforcement presence and to ensure the safety of the public, and keep the peace in the event that there is a disturbance.'" (*Id.* (citing Operations Plan, Defs.' Mot. Ex. E, at § 1.0) (alterations in original).) To carry out this mission, the Wayne County Sheriff's Department dedicated a sizeable force to policing the Festival. The Department provided thirty-four Deputy Sheriffs and nineteen reserve officers for the event.[2] (*Id.* (citing Operations Plan, Defs.' Mot. Ex. E, at § 6.0).) This force included "a mounted unit with six [] horses, a mobile command post, and covered" the entire Festival, which was "divided into multiple zones." (*Id.* (citing Operations Plan, Defs.' Mot. Ex. E, at § 6.0).) Defendants Deputy Chief Richardson and Deputy Chief Jaafar were present at the Festival, serving in the Executive Command Unit; Sheriff Napoleon, however, did not attend. (*Id.* at 3, 4.)

## C.    Pre-Event Correspondence

On May 9, 2012, Plaintiffs sent a letter to Sheriff Napoleon and Wayne County Executive Robert Ficano informing them of their intent to appear at the Festival. (May 9, 2012 Letter, Defs.' Mot. Ex. G.) The letter indicated that in the past, officers with the Sheriff's Office sided with "Muslims" who "physically assault[ed] Israel and his friends[,]" and reminded the recipients that Israel had a right to be there, to express his ideas, and that the Sheriff's Office has "a duty to protect speakers like Israel from the reactions of hostile audiences." (*Id.* (citations omitted).)

---

[2] According to Defendants, "the [number of] personnel allocated to the Festival is larger than the Sheriff's Office['s] contribution to the World Series or the President of the United States when he visits Michigan." (Richardson Aff., Defs.' Mot. Ex. F, at ¶ 5.)

4

Wayne County Corporation Counsel responded to this letter on June 14, 2012. (June 14, 2012 Letter, Defs.' Mot. Ex. H.)  The letter contested Plaintiffs' version of events at the 2011 Festival and stated that "law enforcement" is provided "to the members of the public in a non-discriminatory manner."  (*Id.*)  It further provided that the Sheriff's Office intended "maintain public order consistent with its legal obligations and duties under Michigan law[,]" and explained that The Sheriff's Office "owes a duty to the public as a whole and is not required to serve as a security force for the sole benefit of . . . the 'Bible Believers.'"  (*Id.*)  The recipient was informed that "under state law and local ordinances, individuals can be held criminally accountable for conduct which has the tendency to incite riotous behavior or otherwise disturb the peace."  (*Id.*)  The letter concluded with the following:

> Wayne County has great reverence for the First Amendment, but it cannot protect everyone from the foreseeable consequences that come from speech that is designed[,] and perhaps intended[,] to elicit a potentially negative reaction.  The [Wayne County Sheriff's Office] will not restrict the First Amendment [r]ights of any individual, but, by following the laws requiring the observance of such rights, the [Sheriff's Office] neither cedes its right to maintain the peace nor assumes unto itself liability for the illegal conduct of others.

(*Id.*)

## D.    The 2012 Festival [3]

At the 2012 Festival, "Plaintiffs peacefully engaged in their expressive activity along the public sidewalks and other public areas where pedestrian traffic was permitted."  (Pls.' Resp. 9.)  Members of the Bible Believers donned t-shirts or carried

---

[3] Unless otherwise indicated, the pertinent facts were gleaned from the full-length video submitted by Defendants.  (Video, Defs.' Reply, Ex. A.)

5

banners with messages such as "Only Jesus Christ Can Save You From Sin and Hell,"
"Fear God and Give Him Glory," "Trust Jesus, Repent and Believe in Jesus," "Turn or
Burn," "Jesus is the Way, the Truth and the Life.  All Others Are Thieves and Robbers,"
"Islam Is A Religion of Blood and Murder," and "Muhammad is a . . . liar, false prophet,
murderer, child molesting pervert."  (*Id.* at 9-10; Video, Defs.' Reply, Ex. A.)  One
member of the Bible Believers carried a pig's head on a stick.  Another brought a
megaphone so as to amplify the group's street preaching.  In order to capture the events,
Fisher carried a small hand-held video camera.  (Pls.' Resp. 9.)

Video footage from the event shows members of the Bible Believers entering the
Festival near the carnival-style rides at approximately 5:50PM.  The group stops at what
appears to be the edge of the Festival and Israel begins preaching on a megaphone.
Israel proclaims: "Your prophet is nothing but an unclean swine, your prophet married a
seven-year-old girl, your prophet is a pedophile, and your prophet teaches you not to
believe in Jesus as the Christ."  At this point, a small crowd of what appears to be mostly
children begins forming around the Bible Believers and members from the crowd can be
heard objecting to Israel's speech.  Israel, undaunted by the crowd, announces to the
swelling crowd that "your religion will send you to hell."  According to Israel, this is
because the crowd believes in "a prophet that is a pervert" who "molested a child."  At
this point, the crowd becomes increasingly upset, admonishing Israel for the views he is
expressing.  Israel continues to denounce the Islamic faith and the Prophet Muhammad.

Eventually, members of the crowd begin hurling objects at the Bible Believers.
No member of the Bible Believers responded with violence.  The preacher does,

6

however, indicate that members of the Islamic faith have only violence and murder in their heart.  The street preaching continues, as does the bottle-hurling, and someone in the crowd can be seen encouraging the group of mostly children to disperse.

The first time a law enforcement official is captured on film is when a member of the Sheriff's Office walks up to the Bible Believers.  The official, speaking directly to Israel, explains that Dearborn has an ordinance prohibiting the use of megaphones and that if the group continues to use it, a citation will be issued.  Israel explains that the group used the megaphone the previous year but the official repeats his request.

Eventually, the Bible Believers move from the Festival's perimeter and push further along Warren Avenue.  Despite the movement, the aggression directed towards the Bible Believers continues.  During the video, law enforcement officials are seen trying to quell the crowd and stem the violent conduct.  These efforts, however, were not entirely successful as even with several officers standing in front of the Bible Believers and after the mounted units made several passes by the Bible Believers, debris was thrown at the Bible Believers.  Officials are also seen yanking children from the crowd if seen throwing items.

Plaintiffs engaged in their expressive activities for approximately one-and-a-half hours.  For most of that time, Festival attendees are seen arguing with and throwing objects at the Bible Believers.  Eventually, Richardson pulled Israel aside to ask that the group leave.  He stated that there was a real risk that somebody – either a member of the Bible Believers, a Festival attendee, or someone with the Sheriff's Office – would be injured if the Bible Believers did not cease their activity.  Israel indicated that he had a

7

right to be there and asked Richardson whether he would be arrested should he choose to

stay.  Richardson indicated that he could not be sure whether there would be an arrest but

did indicate that if the Bible Believers did not leave, disorderly conduct citations would

be forthcoming.[4]  Upon hearing this, Plaintiffs departed the Festival.

**E.     Procedural and Other Preliminary Matters**

Plaintiffs filed a three-count § 1983 complaint in this Court on September 25,

2012.  (ECF No. 1.) The Complaint alleges violations of Plaintiffs' rights to (1) free

speech pursuant to the First Amendment, (2) free exercise pursuant to the First

Amendment, (3) and equal protection pursuant to the Fourteenth Amendment.  Plaintiffs

seek nominal damages, costs and fees, and both declaratory and injunctive relief.  On

December 23, 2012, Defendants filed an Answer.  (ECF No. 8.)

Defendants' Motion for Summary Judgment, or in the Alternative, Motion to

Dismiss was filed on January 25, 2013.  (ECF No. 13.)  Plaintiffs responded to

Defendants' motion on February 14, 2013 by filing "Plaintiffs' Motion to Dismiss and

Cross-Motion for Summary Judgment."  (ECF No. 20.)  Defendants replied on February

28, 2013.  (ECF No. 25.)  On February 19, 2013, Plaintiffs filed a Motion for Preliminary

Injunction.  (ECF No. 22.)  Defendants responded to this motion on March 12, 2013,

(ECF No. 29), and Plaintiffs replied on March 24, 2013, (ECF No. 30).

---

[4] No member of Bible Believers received a citation for their actions at the Festival;
however, after being escorted from the Festival due to security concerns, the Bible
Believers' van was pulled over and the driver was issued a citation for driving away in a
vehicle without a license plate.  (Post-Operation Report, Defs.' Mot. Ex. I, at 1.)

The Court held a hearing on the various motions on May 7, 2013.  Having been called on to issue a decision with respect to the parties' dispositive motions at the same time as Plaintiffs' Motion for Preliminary Injunction, the Court finds it unnecessary to address the latter motion as it is rendered moot by the Court's ruling.

Both Plaintiffs and Defendants have filed video recordings as evidence in this case.[5]  Plaintiffs filed objections to Exhibit B, one of Defendants' two video recordings, arguing that the video contains inadmissible hearsay and has not been properly authenticated.  (Pls.' Notice of Objections, ECF No. 31.)  In rendering this decision, however, the Court relies only on the full-length video recording submitted as Exhibit A to Defendants' Reply.  (ECF No. 25.)  Plaintiffs have not challenged Exhibit A and because the Court does not rely on Exhibit B, the Court need not address Plaintiffs' objections.

## II.    STANDARD OF REVIEW [6]

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[5] These recordings are located in the Clerk's Office at the Detroit branch of the United States District Court for the Eastern District of Michigan.

[6] The Court construes Defendants' Motion, titled Defendants' "Motion for Summary Judgment or in the Alternative Defendants' Motion to Dismiss," as a Motion for Summary Judgment.  The same is true for "Plaintiffs' Response to Defendants' Motion for Summary Judgment or in the Alternative Motion to Dismiss & Cross-Motion for Summary Judgment."  Because Defendants filed an answer, (ECF No. 8), a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is untimely.  Plaintiffs analyze the motion under Rule 12(c).  Here, however, both parties have filed exhibits and video evidence which the Court has considered.  Because these videos and other exhibits are outside of the pleadings, the Court disregards Defendants' and Plaintiffs' attempts to couch the motions as being anything other than motions for summary judgment.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2012).  A court

assessing the appropriateness of summary judgment asks "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Amway Distributors Benefits Ass'n v.

Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

    The initial burden of proving the absence of a genuine dispute rests with the

movant, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986), who "must

support the assertion by: (A) citing to particular parts of materials in the record…; or (B)

showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the

fact[,]" Fed. R. Civ. P. 56(c)(1)(A)-(B).   While this inquiry requires the Court to

construe factual disputes, and the inferences there from, in the light most favorable to the

non-moving party, only disputes over facts that might affect the outcome of the suit

preclude the entry of summary judgment.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553;

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

    If the moving party discharges their initial burden using the materials specified in

Federal Rule of Civil Procedure 56(c), the burden of defeating summary judgment shifts

to the non-movant who must point to specific material facts – beyond the pleadings or

mere allegation – which give rise to a genuine issue of law for trial.  *Anderson*, 477 U.S.

at 256, 106 S. Ct. at 2514.  A mere scintilla of evidence supporting the non-movant's

claim will not prevent summary judgment; rather, there must be evidence on which a jury

could reasonably find for the non-movant. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

Moreover, if, "after adequate time for discovery and upon motion," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. When this occurs, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* 477 U.S. at 323, 106 S. Ct. at 2552. Thus, if the non-movant does not support the elements of a claim or defense, the moving party is "entitled to judgment as a matter of law."

Courts evaluate cross motions for summary judgment under the same standard. *La Quinta Corp. v. Heartland Props., L.L.C.*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004). When faced with cross motions for summary judgment, each motion is examined on its own merits. *Id.*

### III.   DISCUSSION

In light of the various claims asserted in the instant action and the necessity of determining whether a constitutional injury was visited upon Plaintiffs before reaching the issue of municipal liability, the Court begins its analysis with Plaintiffs' First Amendment claims and subsequently addresses the equal protection claim.

### A.   FIRST AMENDMENT CLAIMS

### 1.   Free Speech

11

The First Amendment declares, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I. It has long been established that First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the states. *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 630 (1925).

Following the Supreme Court's guidance in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 105 S. Ct. 3439 (1985), courts in the Sixth Circuit analyze free speech claims in tripartite framework. *Saieg*, 641 F.3d at 734 (citing *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005)). The first step is to determine whether Plaintiffs' activities constitute protected expressive conduct. *Id.* (citation omitted). Conveying religious messages on signs, banners, and t-shirts and orally disseminating religious beliefs fall under the purview of the First Amendment.[7] *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 714-15, 120 S. Ct. 2480, 2488 (2000) ("[S]ign displays . . . are protected by the First Amendment.") and *Murdock v. Pennsylvania*, 319 U.S. 105, 110, 63 S. Ct. 870, 873 (1943) (holding that "spreading one's religious beliefs" and "preaching the Gospel" are constitutionally protected activities). The First Amendment also generally protects controversial speech. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 372 (6th Cir. 2011).

Because Plaintiffs' were engaged in protected conduct, the next step is to "identify the nature of the forum, because the extent to which the Government may limit access

---

[7] Defense counsel agreed that these activities are protected by the First Amendment at the May 7, 2013 motion hearing.

12

depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797, 105 S. Ct. at 3446. "The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). "Public streets and sidewalks 'are quintessential public forums for free speech[.]'" *Saieg*, 641 F.3d at 734 (internal quotation marks omitted) (quoting *Hill*, 530 U.S. at 715, 120 S. Ct. at 2489); *see also Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S. Ct. 954, 964 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."). As a general matter, "the government's ability to permissibly restrict expressive conduct" on public streets and sidewalks "is very limited." *Saieg*, 641 F.3d at 734 (quotation omitted).

Having identified the forum in this case as a traditional public forum, the third step is "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius*, 473 U.S. at 797, 105 S. Ct. at 3446. The Supreme Court has repeatedly held that police may not interfere with orderly, nonviolent expressive activities merely because they disagree with the content of the speech or because they fear possible disorder. *See Cox v. Louisiana*, 379 U.S. 536, 551, 85 S. Ct. 453, 462 (1965) (noting that "constitutional rights may not be denied simply because of hostility to their assertion or exercise" and overturning convictions of individuals protesting arrest of civil rights activists) (quotation omitted); *Edwards v. South Carolina*, 372 U.S. 229, 237, 83 S. Ct. 680, 684 (1963) (indicating that political protest speech is protected even though it invites

13

dispute and may stir people to anger).  Similarly, it is axiomatic that the First Amendment "knows no heckler's veto." [8]  *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35, 112 S. Ct. 2395, 2404 (1992) (explaining that "speech cannot be . . . punished or banned[] simply because it might offend a hostile mob"); *Glasson v. City of Louisville*, 518 F.2d 899, 905 (6th Cir. 1975) ("[H]ostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker's message so long as the speaker does not go beyond mere persuasion and advocacy of ideas and attempts to incite a riot.") (citations omitted).

Despite the broad protection afforded to First Amendment freedoms, protection is not absolute.  *Edwards*, 372 U.S. at 239, 83 S. Ct. at 685 (Clark, J. dissenting) ("The priceless character of First Amendment freedoms cannot be gainsaid, but it does not follow that they are absolutes immune from necessary state action reasonably designed for the protection of society.") (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303-04, 60 S. Ct. 900, 903 (1940)); *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (citations omitted).  Far from being an unlimited, unqualified right, the societal value of speech must, on occasion, be subordinated to other values and other considerations.  For example, "[w]hen clear and present danger of riot, disorder, . . . or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious."  *Feiner v. New York*, 340 U.S. 315, 320, 71 S. Ct. 303, 306 (1951) (quoting *Cantwell*, 310 U.S. at 308, 60 S. Ct. at  905).  In *Feiner*, "where a public

---

[8] A "heckler's veto" empowers an audience to cut off the expression of a speaker with whom it disagrees. *See Glasson v. City of Louisville*, 518 F.2d 889, 905-06 (6th Cir. 1975).

gathering threatened to escalate into racial violence and members of a hostile crowd began voicing physical threats, the Supreme Court expressly sanctioned police action that ended the demonstration and arrested the speaker, who had defied police orders to cease and desist." *Papineau*, 465 F.3d at 57 (citing *Feiner*, 340 U.S. at 316-21, 71 S. Ct. at 304-06). The *Feiner* Court reasoned that law enforcement officials were not "powerless to prevent a breach of the peace" in light of the "imminence of greater disorder" that the situation created. 340 U.S. at 321, 71 S. Ct. at 306-07.

A distillation of these principles reveals that when analyzing whether a restriction of speech or expressive conduct at issue in a particular case is justified, courts must consider the particular events and circumstances that occurred near the time and at the moment of the speech and the Government's action to stop that speech. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 106-09, 94 S. Ct. 326, 327-329 (1973); *Sandul v. Larion*, 119 F.3d 1250, 1255-56 (6th Cir. 1997).

### a.   *Parties' First Amendment Arguments*

Plaintiffs argue (1) that Defendants engaged in a content-based restriction of speech because they disagreed with Plaintiffs' speech and (2) that by ordering Plaintiffs to leave under threat of citation, "Defendants' actions empowered the hecklers and censored Plaintiffs' speech in direct violation of the First Amendment[,]" (Pls.' Resp. 17). Plaintiffs further argue (3) that Defendants failed to protect Plaintiffs in the exercise of their constitutional rights.[9]  (*Id.*)  Defendants, on the other hand, contend that their

---

[9] Although these arguments are intertwined, the Court addresses them separately for the sake of completeness.

actions "were motivated by their concern[] for public safety rather than the content of

Plaintiffs' message."  (Defs.' Reply 8; *see also id.* at 16.)  As evidence, Defendants

maintain that "[d]espite . . . efforts at quelling the mounting threat to public safety,"

members of the "Sheriff's Department observed the crowd progress to an unsafe level."

(Defs.' Br. 7 (citing Richardson Aff., Defs.' Mot. Ex. F).)  On the basis of the unedited

video recording submitted by Defendants, (Defs.' Reply, Ex. A), the Court agrees with

Defendants' position and finds that the intervention in this case was justified on public

safety grounds.

**b.      *Did Defendants Intervene because of Disagreement with Plaintiffs' Message?***

        Plaintiffs' first contention is that Defendants engaged in a content-based restriction

of speech.  (Pls.' Resp. 15-18.)  As authority for this position, Plaintiffs explain that "a

listener's reaction to speech is not a content-neutral basis for regulation."  (*Id.* at 16

(citing *Forsyth Cnty.*, 505 U.S. at 134, 112 S. Ct. at 2403-04.)  In effort to bolster this

position, Plaintiffs cite evidence that Jaafar and Richardson described Plaintiffs' speech

as "offensive."  (Pls.' Resp. 7 n.11 (citations omitted).)

        In determining whether a speech regulation is content-based, "[t]he government's

purpose is the controlling consideration."  *Ward v. Rock Against Racism*, 491 U.S. 781,

791, 109 S. Ct. 2746, 2754 (1989). While Defendants' conduct had the effect of

preventing Plaintiffs from further expressive conduct, "a regulation that serves purposes

unrelated to the content of expression is deemed neutral, even if it has an incidental effect

on some speakers of messages but not others."  *Id.* (citation omitted).  In a case such as

this, courts discerning the purpose of a governmental regulation may look to law

16

enforcement operating orders.  *See Potts v. City of Lafayette*, 121 F.3d 1106, 1111-1112

(7th Cir. 1997) (examining law enforcement operation orders put in place for KKK rally).

The Sheriff's Office's Operations Plan for the 2012 Festival states its mission as

follows: "Wayne County Sheriff's Office (WSCO) [will] provide Wayne County citizens,

festival patrons, organizers, [and] merchants with [a] law enforcement presence and []

ensure the safety of the public, and [] keep the peace in the event there is a disturbance."

(Operations Plan, Defs.' Mot. Ex. E, at 1.)  The court in *Potts* upheld a similar law

enforcement operation plan at a KKK rally, noting that violent interactions at previous

rallies made enforcement of the plan necessary.[10]  *Potts*, 121 F.3d at 1111.  Although the

Operations Plan here was adopted upon learning that the Bible Believers would be

attending the Festival, given Plaintiffs assertions about the assaultive conduct directed

toward them at the 2011 Festival, the Operations Plan appears particularly reasonable and

entirely lawful given that keeping the peace and maintaining public safety are content-

neutral purposes.

The Court finds Plaintiffs' reference to *Forsyth County* disingenuous as the facts

of that case are clearly distinguishable from those present here.  In *Forsyth County*, the

Supreme Court addressed a county ordinance which invested a government administrator

with discretion to exact a parade or assembly permit fee in any sum up to $1,000 to

reflect the estimated cost of maintaining public order.  505 U.S. at 130, 112 S. Ct. at

---

[10] The operations order in *Potts* stated that, with regard to the rally, "the mission of
the Lafayette Police Department is to prevent violence, protect persons at the rally, and
protect property and businesses in the downtown Lafayette area while groups of differing
viewpoints express their beliefs."  *Potts v. City of Lafayette*, 121 F.3d 1106, 1111 (7th
Cir. 1997).

2401.  Not only was the ordinance a prior restraint on speech (with a "heavy

presumption" against its validity), but the ordinance lacked clear guidelines or standards

and the Court expressed concern that "[n]othing in the law or its application prevents the

official from encouraging some views and discouraging others through the arbitrary

application of fees."  *Id.* at 130, 133, 112 S. Ct. at 2401, 2403.  In striking the ordinance

down on overbreadth grounds, the Court explained why the ordinance was content-based:

> The county envisions that the administrator, in appropriate instances, will
> assess a fee to cover the cost of necessary and reasonable protection of
> persons participating in or observing said . . . activity.  In order to assess
> accurately the cost of security for parade participants, the administrator
> must necessarily examine the content of the message that is conveyed,
> estimate the response of others to that content, and judge the number of
> police necessary to meet that response.  The fee assessed will depend on the
> administrator's measure of the amount of hostility likely to be created by
> the speech based on its content.  Those wishing to express views unpopular
> with bottle throwers, for example, may have to pay more for their permit.

*Id.* at 134, 112 S. Ct. at 2403 (internal quotation marks and citations omitted).  This

observation led the Court to hold that government regulation of speech or assembly

activities by speakers, motivated by *anticipated* listener reaction to the content of the

implicated communication, is not content-neutral.  *Grider v. Abramson*, 180 F.3d 739,

749 (6th Cir. 1999) (emphasis added) (citing *Forsyth Cnty.*, 505 U.S. at 134-35, 112 S.

Ct. at 2403-04).

    In the instant case, no prior restraint was in place; in fact, Plaintiffs acknowledge

that they "freely engaged" in their "expressive activity along the public sidewalks and

other public areas where pedestrian traffic was permitted."  (Compl. ¶¶ 40, 37.)

Moreover, unlike in *Forsyth County*, officials did not regulate the speech until there was

more than a mere anticipation of hostile listener reaction.  An examination of the video evidence reveals a mounting threat to public safety.  Plaintiffs "freely engaged" in "expressive activity" for well over an hour even though many Festival attendees reacted negatively to Plaintiffs' message soon after Plaintiffs' arrival.  (*Id.*; *see also* Video, Defs.' Reply, Ex. A.)  The negative reactions are evidenced by the throngs of mostly children surrounding the Bible Believers who hurled epithets at the Bible Believers in addition to water bottles and other debris.  (Video, Defs.' Reply, Ex. A.)  The safety threat is evidenced by the fact that Israel is captured on video with a small amount of blood trickling down his forehead.  (*Id.*)

The Court notes that the fact that Jaafar and Richardson found the speech "offensive" is irrelevant to whether they unjustifiably interceded upon Plaintiffs' speech rights.  In fact, the Court believes that their restraint in the face of finding the message "offensive," could be construed in their favor and as evidence that they waited until a tangible public safety threat emerged before intervening.  In sum, the Court agrees with Defendants that the speech regulation was content neutral even though Defendants' actions had "an incidental effect on some speakers but not others."  *Ward*, 491 U.S. at 791, 109 S. Ct. at 2754 (citation omitted).

**c.     *Did Defendants Impermissibly Effectuate a Heckler's Veto?***

Plaintiffs also argue that Defendants impermissibly interfered with their speech by effectuating a heckler's veto.  (Pls.' Resp. 13, 17.)  The Court disagrees.

"This Court respects, as it must, the interest of the community in maintaining peace and order on its streets."  *Feiner*, 340 U.S. at 320, 71 S. Ct. at 306 (citations

19

omitted).  Although the Court recognizes that uncontrolled official suppression of a

speaker "cannot be made a substitute for the duty to maintain order[,]"  *Hague,* 307 U.S.

at 516, 59 S. Ct. at 964, "the power effectively to preserve order cannot be displaced by

giving a speaker complete immunity[,]"  *Niemotko*, 304 U.S. at 289, 71 S. Ct. at 328

(Frankfurter, J., concurring).

      When the government attempts to regulate speech based on the context of that

speech, they must have an actual basis for so doing.  *See, e.g.*, *Boos v. Barry*, 485 U.S.

312, 332, 108 S. Ct. 1157, 1169 (1988) (finding that a government must regulate speech

based on actual violence rather than the mere belief that speech with a certain content

will induce violence).  Where violence is merely anticipated in response to speech,

government action interceding upon that speech is not justified.  *See, e.g.*, *Cox*, 379 U.S.

at 543, 550, 85 S. Ct. at 458, 462 (rejecting State's argument that breach of peace

conviction of civil rights protestor was justified because of a fear of violence erupting

where the evidence was "virtually undisputed" that the protestors were not violent and

did not threaten violence and that although the white crowd was "muttering" and

"grumbling," there was no evidence that any member of the crowd threatened violence);

*Edwards*, 372 U.S. at 236, 231, 83 S. Ct. at 684, 681 (overturning breach of peace

convictions of 187 civil rights protestors where "[t]here was no violence or threat of

violence on [the protestors'] part," and "no evidence at all of any threatening remarks,

hostile gestures, or offensive language on the part of any member of the crowd"); s*ee also*

*Cantwell*, 310 U.S. at 308-09, 60 S. Ct. at 905-06 (finding no imminent violence where

anti-Catholic diatribe angered initially willing listener and provoked a mere suggestion of

violence).  On the other hand, when the facts and circumstances support a finding that an

"immediate threat to public safety, peace, or order[]" exists, "the power of the State to

prevent or punish is obvious." *Cantwell*, 310 U.S. at 308, 60 S. Ct. at 905 (explaining

that "[w]hen clear and present danger of riot, disorder, . . . or other immediate threat to

public safety, peace, or order, appears, the power of the State to prevent or punish is

obvious[]"); *see also Feiner*, 340 U.S. at 321, 71 S. Ct. at 306-07 (reasoning that police

were not "powerless to prevent a breach of the peace" in light of the "imminence of

greater disorder" present at the time of the police action).

The Court finds that the actual demonstration of violence here provided the

requisite justification for Defendants' intervention, even if the officials acted as they did

because of the effect the speech had on the crowd.  As in *Feiner*, where the Supreme

Court approved of a breach of peace conviction for the reaction the speaker's speech

engendered, Defendants were not "powerless to prevent a breach of the peace" in light of

the "imminence of greater disorder" that Plaintiffs' conduct created.  340 U.S. at 321, 71

S. Ct. at 306-07.

### d.    *Did Defendants Violate a Duty to Protect Plaintiffs?*

As discussed above, the video evidence indisputably shows a belligerent crowd

and a growing security threat.  Yet, in spite of this evidence, Plaintiffs contend that

Defendants were derelict in their duty to protect Plaintiffs' expressive conduct.

Although peace officers "must take reasonable action to protect from violence

persons exercising their constitutional rights[,]" *Glasson*, 518 F.3d at 906 (citations

omitted), the broad "police power" traditionally bestowed upon states and their local

2:12-cv-14236-PJD-DRG   Doc # 34   Filed 05/14/13   Pg 22 of 36   Pg ID 316

subdivisions includes the authority to regulate community health and safety, *Grider v. Abramson*, 180 F.3d 739, 748 n.9 (6th Cir. 1999) (citing *De Buono v. NYSA-ILA Med. & Clinical Servs.*, 520 U.S. 806, 814, 117 S. Ct. 1747, 1751 (1997) (citation omitted)).  The question the Court must address, therefore, is whether Defendants took reasonable measures calculated to protect Plaintiffs from violence at the Festival while remaining mindful that law enforcement officials are only required to take "such steps as may be reasonably necessary and feasible to protect [] speakers" from "violence or disorderly retaliation or attack at the hands of those who may disagree and object."  *Glasson*, 518 F.2d at 907 (quotation omitted).

Plaintiffs present two reasons Defendants' efforts fell short.  First, Plaintiffs argue that the issuance of one citation, three verbal warnings, and the temporary detention of two individuals was not a reasonable response in light of the First Amendment interests at stake.  (Pls.' Resp. 17 n.10 (citing Post-Operation Report, Defs.' Mot. Ex. I, at 3).) "Rather, the proper (and constitutional) response would have been to arrest the counter-protestors, *en masse* if necessary – particularly in light of the large number of officers (which included a mounted unit) that were available." [11]  (*Id.* at 17 (emphases removed).)

_____

[11] At the May 7, 2013 motion hearing, Plaintiffs' counsel pointed to Defendants' assertion that the Sheriff's Office's presence was larger at the Festival than its contribution to the security team when the President of the United States visits Wayne County.  Counsel then stated that this large force would have kept the President safe and that it must, therefore, have been able to protect Plaintiffs.  In making this argument, counsel ignores the additional security measures designed to ensure the President's safety, such as the presence of Secret Service personnel, who travel with the President at all times.  *See* United States Secret Service, How Protection Works, http://www.secretservice.gov/protection_works.shtml (last visited May 8, 2013) ("In

Second, Plaintiffs point to Defendants' refusal to provide the Bible Believers with two deputies or a mounted unit to act as Plaintiffs' security detail as evidence that Defendants did not reasonably endeavor to protect them.

The video evidence renders Plaintiffs' claims of a failure to protect implausible given that the video gives a clear picture of the events as they transpired and shows Defendants taking reasonable action. *See, e.g.*, *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) ("The extensive use of video scenes of exactly what took place removed much of the argument and interpretation of the facts themselves.").  A significant number of law enforcement officials were present and trying to quell the crowd.  Officials are seen dispersing the crowd, standing in front of the Bible Believers in an attempt to create a buffer between the speakers and the hostile crowd, and the mounted unit is seen making passes in an effort to demonstrate law enforcement's presence. (Video, Defs.' Reply, Ex. A.)  The presence of the law enforcement officials may have calmed some people in the crowd but it did not alleviate the violence entirely.  (*Id.*) Moreover, "[a]ny subjects [who] were seen throwing objects [were] immediately taken into custody."  (Post-Operation Report, Defs.' Mot. Ex. I, at 1.)

Even when construing the evidence in the light most favorable to Plaintiffs, the evidence also suggests that sheer size of the crowd and expanse of the Festival grounds made it unfeasible to proceed against the crowd.  Unlike in *Cox* and *Glasson*, where law enforcement officials and plenty of physical space separated those engaging in expressive

---

general, permanent protectees, such as the president and first lady, have details of special agents permanently assigned to them.").

conduct from the purportedly hostile crowds (neither of which had actually threatened violence or acted upon any violent impulses), Plaintiffs here were virtually surrounded by throngs of angry Festival attendees, making the situation more analogous to *Feiner*. Compare *Cox*, 379 U.S. at 550, 85 S. Ct. at 462 (finding it noteworthy that the allegedly hostile white crowd was separated from the demonstrators by 100 feet and seventy-five to eighty armed policemen, "including 'every available shift of the City Police,' the 'Sheriff's Office in full complement,' and 'additional help from the State Police,' along with a 'fire truck and the Fire Department[]'") *and Glasson*, 518 F.2d at 902 (finding it significant that allegedly hostile onlookers were located on the other side of the street and had made no effort to cross over to confront the individual holding the sign that angered them) *with Feiner*, 340 U.S. at 318, 71 S. Ct. at 305 (upholding breach of peace conviction where police were faced with a crowd which was pushing and shoving, where one member of the crowd threatened violence, and where the crowd was pressing closer around the speaker and the officers). "It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker." *Niemotko*, 304 U.S. at 289, 71 S. Ct. at 328 (Frankfurter, J., concurring). In other words, the right to speak does not extend to compulsory toleration of disorder and breach of the peace as a result of the exercise of the right.

Despite law enforcement's efforts, when Richardson pulled Israel aside to indicate that the Bible Believers should leave or face the risk of disorderly conduct citations, he clearly indicated that the continued presence of the Bible Believers posed a risk to public safety. (Video, Defs.' Reply, Ex. A.) According to Richardson, not only were Plaintiffs

24

jeopardizing their own safety but the safety of Festival attendees and the law enforcement officials. (*Id.*) This observation was entirely reasonable given that the crowd remained aggressive despite the presence of several – and certainly more than the two requested by Plaintiffs – law enforcement officials trying to maintain the public peace. It must be remembered that "the law does not expect or require [officials] to defend the right of the speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury." *Glasson*, 518 F.2d at 909. Rather, as was the case here, officials "may discharge their duty of preserving the peace by intercepting [a speaker's] message or by removing the speaker for his own protection[.]" *Id.*

In sum, the Court finds that Defendants' actions were designed to prevent disorder as the result of the exercise by Plaintiffs of their constitutional rights. Officials interfered with Plaintiffs' speech only after making an effort to impose order and only when they perceived imminence of further violence and feared, due to the sheer size of the Festival and the number of attendees, that things would spiral out of control. The Court further finds that Defendants acted reasonably in trying to protect Plaintiffs from the crowd before they intervened and that the "strong interest in ensuring the public safety and order[,]" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768, 114 S. Ct. 2516, 2526 (1994), justified Defendants' intervention. The Court believes that the video evidence indisputably establishes the material facts involved in this action and, on the basis of that evidence, finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiffs' free speech claim.

25

2.     **Free Exercise**

The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such. *McDaniel v. Paty*, 435 U.S. 618, 626, 98 S. Ct. 1322, 1328 (1978) (citation omitted). The free exercise component of the First Amendment "embraces two concepts – the freedom to believe and the freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection." *Cantwell*, 310 U.S. at 303-04, 60 S. Ct. 900 at 903.

Plaintiffs' argue that their expressive activity is protected by the Free Exercise Clause in addition to the Free Speech Clause. (Pls.' Resp. 14.) Beyond this conclusory assertion, Plaintiffs provide little in the way of persuasive argument. First, there is nothing in the record that would support a finding that Defendants regulated, prohibited, or rewarded religious certain beliefs.[12] In fact, several other Christian groups proselytized at the Festival without incident. (Defs.' Br. 2.) Second, Plaintiffs' religious conduct "remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 304, 60 S. Ct. 900 at 903. Because the freedom to act is not absolute, state actors may "safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment." *Id.*

---

[12] There is also no evidence to support Plaintiffs' assertions that Defendants were enforcing Sharia law. (Compl. ¶ 66.)

Plaintiffs have failed to provide any evidence supporting their contention that their free exercise rights were violated. In fact, the Court notes that other than to recite to myriad case law, Plaintiffs have failed to provide any details regarding their free exercise claim. The Court will not piece the argument together on behalf of counsel. Put differently, Plaintiffs may not merely announce a position and leave it to the Court to determine and rationalize the basis of this claim. Given the absence of legal argument coupled with the dearth of factual support, Defendants are entitled to summary judgment on Plaintiffs' free exercise claim as a matter of law.

**B.    EQUAL PROTECTION**

The Court now turns to Plaintiffs' Fourteenth Amendment claim, which asserts that Defendants violated Plaintiffs' right to equal protection. The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provision is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985). As the Sixth Circuit has explained, the "threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Regardless of the standard courts use to review an equal protection claim, a plaintiff first must show that it was treated differently than others who were similarly situated. *Mt. Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 406 (6th Cir. 1999).

27

At the outset, the Court notes that Plaintiffs' equal protection claim is seemingly a mere rewording of the free speech claim.  Plaintiffs contend that "Defendants' order to Plaintiffs that they cease their free speech activity . . . based on the adverse reaction of Muslim counter-protestors violated the Equal Protection Clause . . . by denying Plaintiffs access to a public forum to engage in their religious speech activities, which Defendants disfavored by their words and actions, while permitting the Muslims to use this forum to engage in a counter-protest that included committing acts of violence, shouting profanities, and mocking the Christians."  (Pls.' Resp. 19.)  To the extent the equal protection and First Amendment claims coalesce, it may be said that they rise or fall together.  *Thayer v. Chiczewski*, 697 F.3d 514, 532 (7th Cir. 2012) (citation omitted).  However, the Court briefly addresses the equal protection claim below.

The Court is not persuaded by evidence or argument painting the Festival attendees as similarly situated.  Although Plaintiffs' contend that the attendees were "counter-protestors" "engage[d] in a counter-protest[,]" (*id.*) the Court disagrees.[13]  The attendees were members of a hostile crowd reacting to Plaintiffs' speech and despite Plaintiffs' artful attempts to construe them as comparators, the attempt fails.  Moreover, officials did take action against the attendees such as attempting to disperse the crowd and issuing citations, detaining individuals temporarily, and giving verbal warnings.  (Post-Operation Report, Defs.' Mot., Ex. I.)

---

[13] The Court notes that the Post-Operation Report also describes the members of the crowd as counter-protestors.  (Post-Operation Report, Defs.' Mot., Ex. I.)

28

Without having identified a similarly-situated comparator or having shown disparate treatment, Plaintiffs' equal protection claim fails as a matter of law.

## C.    QUALIFIED IMMUNITY

Because the Court finds that Plaintiffs' constitutional rights were not violated, the Court need not address whether Defendants Richardson and Jaafar are entitled to qualified immunity.  The Court, however, does find it appropriate to address municipal liability, which it does immediately below.

## D.    MUNICIPAL LIABILITY

In naming Wayne County and Sheriff Napoleon[14] as defendants, Plaintiffs ask this Court to find the County and the Sheriff's Office liable for the alleged constitutional violation.  In a § 1983 suit, "[a] municipal liability claim . . . must be examined by applying a two pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the [municipality] is responsible for that violation."  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996) (second alteration in original).  Although the Court finds that no constitutional deprivation

---

[14] Sheriff Napoleon is named in his official capacity only.  "'Official-capacity suits represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Everson v. Leis*, 556 F.3d 484, 493-94 n.3 (6th Cir. 2009) (quoting *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 691 n.55, 98 S. Ct. 2108, 2036 n.55 (1978) (alterations omitted)); *see also Moore v. City of Harriman*, 272 F.3d 769, 776 (6th Cir. 2001) (en banc) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office . . . as such, it is no different from a suit against the State itself.") (quotation omitted).  Courts have repeatedly explained that "[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *See, e.g.*, *Briner v. City of Ontario*, 370 F. App'x 682, 699 (6th Cir. 2010) (internal quotation marks and alterations omitted).

occurred, assuming Plaintiffs' rights were violated, the remaining issue is whether Wayne County and the Wayne County Sheriff's Office should be held responsible.

"A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's [unconstitutional] policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2108, 2036 (1978)); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997) (citations omitted).  Regardless of whether the challenged conduct occurred by virtue of a "policy" or "custom," a plaintiff seeking to hold a municipal entity liable must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404, 117 S. Ct. at 1388 (emphasis in original).  In other words, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404, 117 S. Ct. at 1388.

"[T]o prove the existence of a municipality's policy or custom, plaintiffs 'can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final [policy]-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.'" *Mann v. Helmig*, 289 F. App'x 845, 848-49 (6th Cir. 2008) (quotation omitted).  Here, Plaintiffs appear to be pursuing all four avenues, none of which the Court finds persuasive.  Because Plaintiffs' arguments overlap, the various arguments are condensed in two sections immediately below.

1.    **Did County Policy Cause the Constitutional Injury?**

Plaintiffs argue that Wayne "County is ultimately responsible for" the

constitutional violation here because the "order to arrest Plaintiffs for disorderly conduct"

was issued pursuant to "County 'policy[.]'"  (Pls.' Resp. 21 (emphases removed).)

Evidence of this "policy," according to Plaintiffs, takes on many forms: (1) "the County's

agreement to provide law enforcement for the Arab Festival;" (2) "its stated mission to

'keep the peace' at the [F]estival 'in the event there is a disturbance[;]'" (3) "its labeling

of Plaintiff Bible Believers as a 'radical group' that intends to engage in provocative

conduct at the [] Festival;" and (4) "its Corporation Counsel's[] warning to Plaintiffs that

if their conduct has 'the tendency to incite riotous behavior or otherwise disturb the

peace' then Plaintiffs will be held 'criminally accountable,' and further warning Plaintiffs

that the County 'cannot protect everyone from the foreseeable consequences that come

from speech that is designed and perhaps intended to elicit a potentially negative

reaction.'"[15]  (*Id.*)

None of Plaintiffs' purported evidence, however, establishes the existence of an

unconstitutional policy sufficient to impose liability upon the municipality pursuant to

*Monell*.  The Operations Plan, which creates the County's policy with respect to the

---

[15] Plaintiffs also argue that the existence of an unlawful policy is "reinforced by
the fact that Defendant Richardson was seen on video consulting with [the Director of
Legal Affairs for the Wayne County Sheriff's Office] prior to" informing Plaintiffs that a
disorderly conduct citation would be issued if Plaintiffs did not depart the Festival.  (Pls.'
Resp. 21-22.)  This argument identifies the policy of consulting an attorney as evidence
of Defendants' unlawful conduct.  There is simply too tenuous of a connection between
consulting an attorney at the scene of the incident and the existence of an unlawful
policy.  *See Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. 2008).

Festival, explicitly provides that the County "will not abridge or deny anyone's Freedom of Speech, unless public safety becomes a paramount concern." (Operations Plan, Defs.' Mot. Ex. E, at 1.)  Plaintiffs have cited no authority, and the Court has not located any, for the proposition that free speech rights categorically trump the authority of municipal entities to preserve order and protect public safety.

Plaintiffs also contend that Jaafar and Richardson were in the "Executive Command Unit" at the Festival, and that as such, they were "plainly in charge of the law enforcement actions at the Arab Festival on behalf of the County." (Pls.' Resp. 21.)  To the extent Plaintiffs employ this language in an effort to fasten liability to the County, the attempt fails as "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." *Mann*, 289 F. App'x at 849.  Rather, it is "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered[]" that municipal liability attaches. *Id.*  "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to liability based on an exercise of that discretion." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82, 106 S. Ct. 1292, 1299-1300 (1986)); *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Discretion to act is not to be confused with policymaking authority[.]") (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S. Ct. 915, 926 (1988) (plurality opinion)).

As Chief Deputies in the Sheriff's Office, neither Jaafar nor Richardson possessed final policymaking authority. (Napoleon Aff., Defs.' Reply Ex. C, at ¶ 4.)  While such

authority may be delegated, *Pembaur*, 475 U.S. at 483, 106 S. Ct. at 1300, "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are . . . not constrained by the official policies of superior officials[,]" *Feliciano*, 988 F.2d at 655. Moreover, while liability may attach if an official with final policymaking authority ratifies the discretionary actions of subordinates, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." [16] *Feliciano*, 988 F.2d at 656 (citation omitted).

In the absence of evidence suggesting either Chief Deputy contacted Sheriff Napoleon for approval or that the County somehow delegated policymaking authority to either Chief Deputy, the mere fact that Jaafar and Richardson were in the "Executive Command Unit" does not transform their discretionary actions at the Festival into a decision of the County. "Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from *respondeat superior* liability." *Feliciano*, 988 F.2d at 656 (italics added) (quotation omitted). The Court rejects Plaintiffs' argument that Jaafar and Richardson were transformed into *de facto* policymakers by virtue of their presence in the "Executive Command Unit" at the Festival. Even assuming that Jaafar and Richardson

---

[16] Even if Plaintiffs could establish that a policymaking official ratified the actions of Jaafar and Richardson after the fact, they would still have to demonstrate that this ratification was a "moving force" causing the constitutional violation. *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 n.6 (6th Cir. 1993)

had been vested with authority to make limited decisions regarding policing at the Festival, Plaintiffs fail to explain how this differs from "mere authority to exercise discretion[.]" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (rejecting argument that county delegated authority to shift commander and on-call doctor merely because that individual had authority to make limited decisions concerning inmate medical care during her shift).

The policies cited by Plaintiffs were not, contrary to Plaintiffs' assertions, "the moving force" of the purported constitutional violation. (Pls.' Resp. 21.) The policies challenged in this action are entirely lawful and if Plaintiffs' rights were violated, which they were not, any such violation would have been caused not by County policy but rather by a violation of County policy. Because "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory[,]" *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036 (emphasis in original), a violation of County policy would sever the causal connection required to hold the municipality liable. *Cf. Praprotnik*, 485 U.S. at 127, 108 S. Ct. at 926 (plurality opinion) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").

## 2.      Did a Failure to Train or County Custom Cause the Constitutional Injury?

Plaintiffs contend that "the County has failed to adequately train or supervise its employees with regard to the First Amendment rights of speakers who express disfavored messages to a hostile crowd." (Pls.' Resp. 20 n.11 (citing Compl. ¶¶ 67-69).) A municipality's failure to train or failure to provide adequate training is another method of

34

demonstrating the existence of an unlawful policy or custom supporting municipal liability under § 1983. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989); *Ellis*, 455 F.3d at 700.

To prevail on a failure to train claim, a plaintiff must establish three elements: "(1) the training [] was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700 (citation omitted).   Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] action [or inaction]." *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1360-61 (2011) (citation omitted).

Other than citing to allegations in the Complaint and "the County's pattern of conduct in 2011 and again in 2012," Plaintiffs have made no effort to provide a factual basis for their failure to train claim.  (Pls.' Resp. 20 n.11 (citing Compl. ¶¶ 67-69).) Plaintiffs have not indicated whether a training program was in place or how the training was deficient.  Plaintiffs are not entitled to rely on the conclusory allegations contained in their Complaint to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514 (nonmoving parties must point to specific material facts – beyond the pleadings or mere allegation – which give rise to a genuine issue of law for trial to defeat summary judgment).

Assuming for the sake of argument that Richardson and Jaafar violated Plaintiffs' constitutional rights, the Court concludes that municipal liability is inappropriate. Plaintiffs argue that the cause of the purported constitutional injuries is either (1) a policy

evidenced by the County's agreement to provide law enforcement for the Festival, the Operations Plan, and Corporation Counsel's June 14, 2012 letter, (2) the fact that Jaafar and Richardson were in the "Executive Command Unit" at the Festival, or (3) the County's custom of failing to train its officers to respect First Amendment rights. Although Plaintiffs' counsel suggested at the motion hearing that the Court "tie [the] pieces together," having rejected each argument, the Court declines counsel's invitation.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court concludes the absence of a dispute about material facts entitles Defendants to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, or in the Alternative, Defendants' Motion to Dismiss, (ECF No. 13), is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Dismiss and Cross-Motion for Summary Judgment, (ECF No. 20), is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (ECF No. 22), is **MOOT**.


Date:  May 14, 2013

                              s/PATRICK J. DUGGAN
                              UNITED STATES DISTRICT JUDGE


Copies to:
**David Yerushalmi, Esq.**
**Robert J. Muise, Esq.**
**Nabih H. Ayad, Esq.**